UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**STEVE AARON**, et al,

      Plaintiffs,

                          Case No.:     8:09-cv-2493-SDM-TGW

vs.

**THE TRUMP ORGANIZATION, INC.,**
a New York Corporation, and **DONALD J.
TRUMP**, an individual,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

      Plaintiffs, Steve Aaron, Ilene Aaron, Rudolph Alexander, Martha Alexander,

Arroyo Holdings, LLC,  Benjamin Benvenuti, Thomas Bower , Chidi Ahanotu,  Robert

Gesemyer, Alan Bridges, Burge Holdings, LLC, Art P. Caruso, Jill L. Caruso, Michael D.

Dinkel, Ken Dilger, Vic Fangio, Thomas Frederick, Deborah Frederick, James R.

Frederick, Catherine Gouze, $H_2O$ Front Investments, LLC, Dwight J. Halligan, Integrated

Properties, LLC, Jeff Italiano, Elaine Lucadano, Thomas R. Warren, Naik Family Limited

Partnership, F. Blaine Panico, Lenard E. Rodgers, Gregory P. Rodgers, Patrick Rodgers,

Cheri Rodgers Jaensch, Sehwani Enterprises, Inc., Joe Shultz, NLR, T, LLC, Dennis

Crum, Douglas J. Rhoten, John Robbins, Rosanna Schanne, TReal, LLC, William S.

Zwick, Tamboli Family Limited Partnership, Kenneth Olipra, Adaja Properties, LLC,

Alex Petro, James S. Moody, III, Ashley Moody, Patricia Moody McNab, individually,

and on assignment from James S. Moody, Jr., and Irma C. Moody as trustee of the Irma

Moody Revocable Trust, Logan Mitchell, George Galiouridis, Terrence Collins, and Clifford Williams,  (collectively, "**Plaintiffs**") sue Defendants, The Trump Organization, Inc., a New York corporation ("**Trump Co.**"), and Donald J. Trump, an individual ("**Trump**") ("Trump" and "Trump Co." shall be referred to collectively as "Defendants"), and allege:

## INTRODUCTION

1.      This case involves a series of fraudulent and negligent misrepresentations made by Trump and Trump Co. in their efforts to convince the Plaintiffs to purchase units in a high rise luxury condominium tower to be located in downtown Tampa, Florida near the Hillsborough River.

2.      Trump and Trump Co., through marketing materials and public statements, held themselves out as true partners and joint developers of the project known as Trump Tower Tampa, a Condominium (the "**Trump Tower**"), to entice the Plaintiffs and others to purchase units in the Trump Tower.

3.      In truth, Trump and Trump Co. were not partners or developers in Trump Tower, and had only sold the "Trump" name to use in inducing buyers to purchase units. The Plaintiffs all purchased units of various sizes with the understanding that they were buying a Trump development, when in actuality they were buying a project developed by SimDag/Robel, LLC ("**SimDag**"), and named "Trump."

## THE PARTIES, JURISDICTION AND VENUE

4.      The jurisdiction of this Court is invoked pursuant to the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703 *et seq.*, and 28 U.S.C. §§ 1331.

2

5.     This Court also has supplemental jurisdiction over the Plaintiffs' pendent claims in accordance with Federal Rule of Civil Procedure 18(a) and 28 U.S.C. § 1367, as those state law claims are so related to the federal question claim alleged that they form part of the same case or controversy under Article III of the United States Constitution.

6.     All of the Plaintiffs entered into purchase contracts and paid money to buy condominium units in the Trump Tower in the form of substantial cash deposits of millions of dollars.  The Defendants have copies of the Plaintiffs' reservation agreements and purchase contracts, and due to the voluminous nature of such documents and the personal, confidential information included in such documents, the documents are not attached to the complaint but shall be produced separately to the Defendants, if requested.

7.     Trump is a resident of the State of New York and, at all times material, was doing business under the laws of the State of Florida.

8.     Trump Co. is a foreign corporation and, at all times material, was doing business under the laws of the State of Florida.

9.     At all times material, Trump and Trump Co. acted within the scope of Section 718.103(16), Florida Statutes, and 15 U.S.C. § 1701(5).

10.    The Court has personal jurisdiction over the Defendants because, at all times material, the Defendants have directly, or through their agents, officers, and/or representatives, operated, conducted, engaged in, and carried on a business venture in the State of Florida, committed acts within the State of Florida related to the allegations set forth herein, and caused injury to the Plaintiffs arising out of acts and/or omissions by the Defendants, which occurred in Tampa, Hillsborough County, Florida.

11.     Venue is proper within this district because the cause of action set forth

below accrued in Hillsborough County, Florida, and a substantial part of the events or

omissions giving rise to the Plaintiffs' claims occurred in Hillsborough County, Florida,

and the real property that is the subject of the action is situated in Hillsborough County,

Florida.  Venue is also proper in the Middle District of Florida because all of the

Defendants transacted business in the Hillsborough County, Florida.

### FACTS COMMON TO ALL COUNTS

12.     Trump Tower was a residential condominium development planned for

190 units, which was originally scheduled for building and substantial completion no

later than December 31, 2008, at 103 Ashley Street in downtown Tampa.

13.     At all times relevant to this action, the Defendants held themselves out as

partners and joint developers of Trump Tower, and that "Donald J. Trump [is a]

worldwide renowned builder and developer of real estate."

14.     From its inception, the Defendants, acting within the scope of Section

718.103(16), Florida Statutes, and 15 U.S.C. § 1701(5), along with SimDag, marketed

Trump Tower as "A Donald J. Trump Signature Property" and "A Development of

Donald J. Trump and SimDag-RoBEL, LLC."

15.     Among other things, and merely offered as an example, on January 10,

2005, the Defendants, acting within the scope of Section 718.103(16), Florida Statutes,

and 15 U.S.C. § 1701(5), issued a press release titled "Donald J. Trump To Partner With

SimDag-Robel In Developing A New Residential Condominium Tower In Downtown

Tampa" that made the following material representations: "Donald J. Trump announced

4

today plans for a 52-story, ultra-luxury condominium in downtown Tampa, Florida, to be called Trump Tower Tampa. The project will be developed in a partnership with local Tampa Bay-area developers SimDag-RoBEL, LLC. Trump Tower Tampa will be Mr. Trump's first project, as well as the tallest residential building, on the Gulf of Mexico." A copy of the Defendants' January 10, 2005 press release is attached hereto as **Exhibit No. 1**.

16.     The January 10, 2005 press release issued by the Defendant goes on to state: "We are developing a signature landmark property . . ." and that "Donald J. Trump established The Trump Organization in 1974 as the umbrella organization for all of his real estate developments and other corporate affiliates. No other real estate company has established the international brand identity that Trump has created. In addition to being the largest developer in New York, Mr. Trump is currently developing residential, hotel, and golf club projects in Chicago, Los Angeles, Toronto, Phoenix, Las Vegas, Miami, the Caribbean, Westchester, NY, Bedminister, NJ, and Seoul, South Korea."

17.     In addition, the Defendants, acting within the scope of Section 718.103(16), Florida Statutes, and 15 U.S.C. § 1701(5), made numerous material representations through promotional materials, websites, and statements to media (both print and television media) that held themselves out as a developer and partner in the Trump Tower development and that the Defendants had a substantial financial stake in the development.  Trump, on a number of occasions, stated that he would like to "buy more of a stake" in the development.

18.     All of the Plaintiffs, in reliance on the Defendants' material

representations, entered into agreements for the purchase of condominium units in Trump

Tower and paid millions of dollars in deposits to secure their units.

19.     Thereafter, the Trump Tower development's financing plans and

fundamental timeline for construction and completion materially changed.  The

Defendants never completed the Trump Tower.

20.     Subsequent to making their deposits and the demise of the Trump Tower

development, in approximately May 2007, the Plaintiffs discovered for the first time that

contrary to the representations made by Defendants, neither Trump nor Trump Co. had an

interest in the property or SimDag, and the Defendants participated in the development

only through the licensing of the "Trump" name.  That discovery was made as a result of

a lawsuit filed by Trump against SimDag on or about May 25, 2007.

21.     In the lawsuit against SimDag filed in the United States District Court for

the Middle District of Florida on May 25, 2007, Trump sought millions of dollars in

unpaid fees from SimDag and others, pursuant to a confidential and previously

undisclosed license agreement entered into between Trump and SimDag on October 27,

2004 (the "**License Agreement**").  A copy of the License Agreement, along with

amendments thereto, is attached hereto as **Exhibit No. 2**.

22.     Pursuant to the confidential and previously undisclosed License

Agreement, SimDag agreed to pay Trump a base license fee in the amount of

$4,000,000.00, as well as an additional license fee in an amount equal to 50% of the

defined Net Sales Profit of the Development.  In return, Trump provided SimDag with a

6

license to use the Trump name and associated marks. The existence of the confidential License Agreement between Trump and SimDag was made public by the media on or about May 30, 2007.

23.     The License Agreement included a confidentiality provision that prohibited both Trump and SimDag from disclosing the existence of the agreement or its contents to anyone for any purpose, unless required by law.  Specifically, the Confidentiality clause provides:

> **Confidentiality**.   Licensor and Licensee covenant and agree that, without the written consent of the other Party, unless required by law, **they will not, under any circumstances, disclose or permit to be disclosed the existence of this Agreement or any of its contents, to any persons or entities for any purpose whatsoever,** other than solely to their respective shareholders, directors, members, officers and other employees, attorneys and accountants (collectively, "Affiliated Parties"), in each such case, on a "need to know basis." All Affiliated Parties shall be deemed bound by the provisions of this Paragraph 15. In connection with any such permitted disclosure to any Affiliated Parties, Licensor and Licensee, as applicable, shall be liable to the other Party for the acts or omissions of their Affiliated Parties that are in violation of this Paragraph 15.

24.     In response to the lawsuit filed by Trump, SimDag filed a counterclaim against Trump for breach of contract for Trump's disclosure of the confidential License Agreement to the public by attaching that document to his lawsuit filed in the public record.

25.     The Plaintiffs have retained the undersigned counsel to represent them and are obligated to pay their attorneys a reasonable fee and costs for their services rendered in this action.

26.     All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have occurred have been performed or have been waived.

## COUNT I
### (ISLA VIOLATION, 15 U.S.C. § 1703)

27.     The Plaintiffs reallege and incorporate by reference Paragraphs 1-26 above as if fully stated herein.

28.     This is an action against the Defendants for violation of the Interstate Land Sales Full Disclosure Act ("**ILSA**"), 15 U.S.C §1703(a)(2), pursuant to 15 U.S.C. §1709(a).

29.     The purpose and intent of ILSA is to insure that buyers, like the Plaintiffs, are informed of facts that will enable them to make an informed decision about purchasing real estate property and prohibits developers, like the Defendants, from making material false statements or omissions about the development, like the Trump Tower development.

30.     At all times material, the Defendants were each participants in the sale or marketing of real property interests in the Trump Tower development, which was marketed by means of interstate commerce and are subject to regulation under the ILSA.

31.    The Defendants were actively, and in direct face-to-face participation, involved in the sale and advertisement of the Trump Tower development, which included, without limitation, the promotional plan for the development.  At all times material, the Defendants offered to sell, directly sold, and advertised the sale of condominium units in the Trump Tower development.

32.    The Defendants were not merely incidental players in the sales scheme, but actively involved in the planning and promotion of the Trump Tower development.

33.    The participation and activities of Trump and Trump Co. in relation to the marketing of the development and the luring of Plaintiffs as buyers of a condominium unit within the development make the Defendants, Trump and Trump Co., responsible under ILSA as developers and/or as agent and/or as aiders and abettors of Trump Co.

34.    The Defendants have engaged in activities prohibited by the ILSA, which include, but are not limited to, the following: (a) employing a device, scheme, or artifice to defraud; (b) obtaining money by means of an untrue statement of a material fact, or by an omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision; and (c) engaging in a transaction, practice, or course of business which operates or would operate as fraud or deceit upon a purchaser.

35.    For the purpose of inducing the Plaintiffs to enter into the purchase agreements and pay millions of dollars in deposits, the Defendants, through their officers, directors, and agents, made numerous material representations regarding the Trump

Tower development, which included, but are not limited to, the following: (a) that all of the Defendants were partners and joint developers in the Trump Tower development; (b) that Trump possessed a substantial ownership interest in the development; and (c) that the Trump Tower would be completed and the condominium units would be delivered to Plaintiffs no later than December 31, 2008.

36.     In reliance on the Defendants' representations, and lured by the marketing activities of the Defendants and their represented interests in the development, the Plaintiffs entered into purchase agreements and paid millions of dollars in deposits to secure condominium units in the Trump Tower.

37.     The representations made by Defendants were false and/or misleading and known by the Defendants to be false and/or misleading at the time these representations were made because, among other things, and merely offered as examples without limitation: (a) the roles and interests of the respective Defendants in connection with the Trump Tower development were and are different than as represented by the Defendants; and (b) the Defendants had no intention and/or ability to complete the Trump Tower and deliver the condominium units to the Plaintiffs by December 31, 2008.

38.     As a result, the Plaintiffs have been injured and damaged by the actions of the Defendants.

39.     The Plaintiffs have retained the undersigned counsel to represent them in this action and are entitled to recover their attorneys' fees and costs pursuant to 15 U.S.C. § 1709(c).

WHEREFORE, the Plaintiffs demand judgment in their favor and against the Defendants, Donald J. Trump and The Trump Organization, Inc., for damages together with prejudgment interest, attorneys' fees and costs, and for such further relief as the Court deems appropriate.

## COUNT II
## (NEGLIGENT MISREPRESENTATION)

40.     The Plaintiffs reallege and incorporate by reference Paragraphs 1-26 above as if fully stated herein.

41.     This is a common law claim for negligent misrepresentation against the Defendants.

42.     The representations made by the Defendants and their employees and agents and information provided by the Defendants in their sales, promotional, and offering materials, including the Prospectus, the Property Report, the official Development website, press releases and the Purchase Agreement were false and/or misleading with regard to Trump Tower development with such gross negligence as to warrant punitive damages. Among other things, and without limitation, the Defendants materially represented that: (a) the roles and interests of the Defendants in connection with the development, particularly Trump and Trump Co., were different than they in fact were and are; and (b) the Trump Tower development would be completed not later than December 31, 2008.

43.     The representations made by Defendants regarding their respective roles and interests, and the estimated date for construction and completion of the Trump Tower

development were false and misleading and material to the Plaintiffs, and relied upon by Plaintiffs, in entering into their purchase agreements and paying their deposits.

44.    The Plaintiffs reasonably relied on those false and/or misleading representations by the Defendants and their employees and agents, and the information provided by the Defendants when the Plaintiffs entered their purchase agreements and paid their deposits.

45.    As a result, the Plaintiffs have been injured and damaged by the actions of the Defendants.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against the Defendants, Donald J. Trump and The Trump Organization, Inc., for damages, including punitive damages, together with prejudgment interest, and for such further relief as the Court deems appropriate.

## COUNT III
## (FRAUDULENT MISREPRESENTATION)

46.    The Plaintiffs reallege and incorporate by reference Paragraphs 1-26 above as if fully stated herein.

47.    This is a common law claim for fraudulent misrepresentations against the Defendants.

48.    The representations made by the Defendants and their employees and agents and information provided by the Defendants in their sales, promotional, and offering materials, including the Prospectus, the Property Report, the official development website, press releases and the Purchase Agreement were false and/or

misleading with regard to the Trump Tower development with such gross negligence as to warrant punitive damages. Among other things, and without limitation, the Defendants materially represented that: (a) the roles and interests of the Defendants in connection with the development, particularly Trump and Trump Co., were different than they in fact were and are; and (b) the Trump Tower development would be completed not later than December 31, 2008.

49.     The representations made by Defendants regarding their respective roles and interests, and the estimated date for construction and completion of the Trump Tower development were false and misleading and material to the Plaintiffs, and relied upon by Plaintiffs, in entering into their purchase agreements and paying their deposits.

50.     The Plaintiffs reasonably relied on those false and/or misleading representations by the Defendants and their employees and agents, and the information provided by the Defendants when the Plaintiffs entered into their purchase agreements and paid their deposits.

51.     As a result, the Plaintiffs have been injured and damaged by the actions of the Defendants.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against the Defendants, Donald J. Trump and The Trump Organization, Inc., for damages, including punitive damages, together with prejudgment interest, and for such further relief as the Court deems appropriate.

## <u>COUNT IV</u>
## (INFORMATION NEGLIGENTLY SUPPLIED)

52.     The Plaintiffs reallege and incorporate by reference Paragraphs 1-26 above as if fully stated herein.

53.     This is a common law claim for information negligently supplied against the Defendants.

54.     At all times material, the Defendants, in the course of their business, owed a duty to supply truthful and accurate information for the guidance of others, like the Plaintiffs.

55.     As a result of the Defendants' misrepresentations and other false information provided to the Plaintiffs, and the Defendants' conduct as set forth above, the Defendants breached their duties owed to the Plaintiffs by supplying false and misleading information for the Plaintiffs' guidance with such gross negligence as to warrant punitive damages.

56.     As a direct and proximate result of the Defendants' wrongful conduct, the Plaintiffs have been injured and damaged.

**WHEREFORE,** the Plaintiffs demand judgment in their favor and against the Defendants, Donald J. Trump and The Trump Organization, Inc., for damages, including punitive damages, together with prejudgment interest, and for such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand a jury trial on all issues so triable against the

Defendants, The Trump Organization, Inc., and Donald J. Trump.

**CLARK & MARTINO, P.A.**
J. Daniel Clark, Esq.         FBN 0106471
3407 W. Kennedy Boulevard
Tampa, FL 33609
(813) 879-0700
(813) 879-5498 (Facsimile)
dclark@clarkmartino.com
www.clarkmartino.com

- and -

**WILLIAMS SCHIFINO MANGIONE &**
     **STEADY, P.A.**
Kenneth G. Turkel, Esq.      FBN 867233
V. Stephen Cohen, Esq.       FBN 0948756
201 N. Franklin Street, Suite 3200
Tampa, Florida 33602
(813) 221-2626
(813) 221-7335 (Facsimile)
kturkel@wsmslaw.com
www.wsmslaw.com
scohen@wsmslaw.com

By: ___/s/ J. Daniel Clark_____
          J. Daniel Clark, Esq.

**Attorneys For Plaintiffs**

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 22nd day of March, 2010, a true and correct copy of the foregoing Second Amended Complaint and Demand For Jury Trial was filed electronically. Notice of this filing will be sent to all parties in this case by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/   J. Daniel Clark
       J. Daniel Clark, Esq.

# EXHIBIT 1



**TRUMP TOWER**
*Tampa*
A DONALD J. TRUMP SIGNATURE PROPERTY

**Contacts:**

Jill Cremer
The Trump Organization
212-832-2000

David Hooks
SimDag-RoBEL, LLC
813-417-8520

**For Release January 10, 2005**

### DONALD J. TRUMP TO PARTNER WITH SIMDAG-ROBEL IN DEVELOPING A NEW RESIDENTIAL CONDOMINIUM TOWER IN DOWNTOWN TAMPA

**NEW YORK, NY – January 10, 2005** – Donald J. Trump announced today plans for a 52-story, ultra-luxury condominium in downtown Tampa, Florida, to be called Trump Tower Tampa. The project will be developed in a partnership with local Tampa Bay-area developers SimDag-RoBEL, LLC. Trump Tower Tampa will be Mr. Trump's first project, as well as the tallest residential building, on the Gulf of Mexico.

"We are developing a signature landmark property so spectacular that it will redefine both Tampa's skyline and the market's expectations of luxurious condominium living," stated Trump. "Trump Tower Tampa will undoubtedly have a phenomenal impact on the city."

The $220-million development will be located on a 1.5-acre site at 111 South Ashley Drive along the Hillsborough River in the heart of Tampa's financial and cultural districts. The building will feature 190 condominium and penthouse residences ranging from 1,991 square feet to 6,150 square feet and priced from $700,000 to over $5.5 million.

Owners will have such privileges as concierge and valet services, a conference room/business center, a party room with a catering kitchen, a fitness center and spa, a restaurant, retail shops, serviced suites for overnight guests, private elevator lobbies, billiards and game rooms and state-of-the-art security services. The residential lobby and other spaces will feature exotic wood finishes, imported marble floors with inlaid onyx highlights and a fine art collection.

(MORE)

**TRUMP TO DEVELOP NEW TOWER IN TAMPA ... page 2**

"I appreciate Mr. Trump's investment in Tampa," said Mayor Pam Iorio. "This is an exciting residential project along our Riverwalk and will add greatly to building a vibrant downtown neighborhood."

"Mr. Trump continually sets new standards in every market he enters," stated Dr. Howard Howell, a partner in SimDag-RoBEL, LLC. "Our partnership will assure a luxurious, sophisticated and elegant lifestyle unlike anything that currently exists in, or is planned for, the Tampa Bay area."

Jody Simon, also a SimDag-RoBEL partner, added, "This project, at this time, in this location, is exactly the right catalyst to accelerate our downtown development and further establish Tampa as one of the nation's most desirable cities. The location – where the Hillsborough River meets the bay – is ideal for a development of this caliber. Every unit will feature beautiful views of the water and our spectacular sunsets."

Trump Tower Tampa is designed by the prominent Tampa-based firm of Smith Barnes Santiesteban Architecture, Inc. The project will be built by Turner Construction, one of the nation's leading general contractors and the most experienced builders of high-rise developments in Florida.

SimDag-RoBEL, LLC is a partnership of five successful, Tampa Bay-area real estate veterans: Dr. Howard Howell, Patrick Sheppard, Frank Dagostino, Jody Simon and Robert E. Lyons. The partners have completed over 1,000 luxury condominium and townhouse projects in the Tampa Bay market.

Donald J. Trump established The Trump Organization in 1974 as the umbrella organization for all of his real estate developments and other corporate affiliates. No other real estate company has established the international brand identity that Trump has created. In addition to being the largest developer in New York, Mr. Trump is currently developing residential, hotel and golf club projects in Chicago, Los Angeles, Toronto, Phoenix, Las Vegas, Miami, the Caribbean, Westchester, NY, Bedminster, NJ and Seoul, South Korea.

Further information on Trump Tower Tampa is available online at www.trumptowertampa.com.

# # #

**SATELLITE B-ROLL PACKAGE AVAILABLE ... next page**

## SATELLITE B-ROLL PACKAGE AVAILABLE

THE SATELLITE FEED CONTAINS:

B-Roll:  Donald Trump signing contract for Trump Tower Tampa with representatives from Tampa-based development company SimDag-RoBEL; other residential Trump properties; Trump Tower Tampa logo; rendering of Trump Tower Tampa building

SOT:  Donald Trump of The Trump Organization; Jody Simon and Dr. Howard Howell of SimDag-RoBEL

**FEED DATE:  Monday, January 10, 2005**
**FEED TIME:   3:30 p.m.- 3:45 p.m. EST**
**COORDINATES:  C BAND: IA (formerly Telstar) 6 (C)   /TRANSPONDER 16  /AUDIO 6.2 & 6.8**
**DL:   4020 (H)**

**RE-FEED DATE: Tuesday, January 11, 2005**
**RE-FEED TIME:    10:00-10:30 a.m. EST (Fed in Rotation)**
**COORDINATES:  C BAND: IA (formerly Telstar) 5 (C)  /TRANSPONDER 19  /AUDIO 6.2 & 6.8**
**DL:   4080 (V)**

Produced for: The Trump Organization and SimDag-RoBEL, LLC
FOR STORY INFORMATION, CONTACT: Jill Cremer, Vice President, The Trump Organization, (212) 832-2000 or David Hooks, SimDag-RoBEL, LLC, (813) 417-8520
FOR TECHNICAL INFORMATION, CONTACT: Medialink (212) 682-8300

THIS FEED IS FREE FOR UNRESTRICTED USE. A HARD COPY OF TAPE NUMBER (01NY05-0029) CAN BE OBTAINED BY CONTACTING MEDIALINK AT 212-812-7040.

# EXHIBIT 2

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa - 8-10-04v4 (3).doc

# LICENSE AGREEMENT

## DONALD J. TRUMP,

as Licensor

and

## SIMDAG/ROBEL, LLC

as Licensee

Date:  October [7], 2004

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa – 8-10-04v4 (3).doc

## LICENSE AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made as of the 2 7 day of October, 2004, between **DONALD J. TRUMP**, worldwide renowned builder and developer of real estate who enjoys the highest reputation in these fields among others ("**Licensor**"), who has a principal place of business at 725 Fifth Avenue, New York, New York 10022, and **SIMDAG/ROBEL, LLC**, a Florida limited liability company ("**Licensee**") whose principal place of business is 102 West Whiting Street, Tampa, Florida 33602. The Licensor and Licensee may hereinafter be referred to as the "**Parties**" and individually as the "**Party**".

**WHEREAS**, Licensor is the sole and exclusive owner of (i) the United States Trademark registrations, among others, identified in Schedule "1" annexed hereto and made a part hereof; and (ii) certain other rights in the name, trademark, service mark, designation, and identification "Trump".

**WHEREAS**, promptly after the date hereof Licensor will file a United States Trademark application for "Trump Tower Tampa" (such trademark application, the "**New Trump Mark**") covering, real estate services; namely, selling, leasing and managing commercial, residential, and retail property.

**WHEREAS**, Licensee intends to (i) develop a first class, luxury residential condominium building of approximately 190 units and at a height of approximately 598 feet above sea level or 50 stories (the "**Building**") to be located at 103 Ashley Street, Tampa, Florida on certain land ("**Land**") owned or to be acquired by Licensee, which land is more particularly described on Exhibit A annexed hereto (the Land, together with the Building, collectively, the "**Tower Property**"), (ii) subject the Tower Property to the residential condominium form of ownership which may contain certain retail and/or commercial components; (iii) market, sell and/or lease the residential and retail and/or commercial condominium units in the Building and (iv) design, develop, construct, operate and maintain the Building according to the "Trump Standards" (as herein defined) so as to maximize the value of the Tower Property for the benefit of Licensee and Licensor. The Building will be known, subject to the provisions of this Agreement, as "Trump Tower Tampa."

**WHEREAS**, Licensee desires to "exclusively" (as herein defined) license and use the registered and common law New Trump Mark in connection with identifying, marketing, selling and promoting the Building, in accordance with the provisions of this Agreement.

**WHEREAS**, Licensor is granting Licensee an exclusive license hereunder, and right to use the registered and common law New Trump Mark in accordance with and subject to the terms, covenants and provisions of this Agreement.

**WHEREAS**, Licensee may also desire to develop and use a certain logo or logos in connection with its use of the New Trump Mark in accordance with the provisions of this Agreement.

**WHEREAS**, adoption and/or use of any such logo or logos is subject to the written approval of Licensor and other terms and conditions set forth below.

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa - 8-10-04v4 (3).doc

NOW, THEREFORE, for One ($1.00) Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee do hereby agree as follows:

1.      **License; Territory; Licensor Restrictions.**  (a) Licensor hereby grants to Licensee, during the "Term" (as herein defined) of this Agreement, an "exclusive" (as herein defined), non-assignable (except as provided in Section 10(b) hereof), nontransferable right, without the right to grant sublicenses, to use the New Trump Mark solely for the purpose of identifying, marketing, and promoting the Tower Property at its above-mentioned location, subject to all the terms, covenants and provisions of this Agreement. Licensee shall be required to, and hereby agrees to, use the New Trump Mark as the sole identification of the Building during the Term.  Licensee acknowledges and agrees that, in all uses of the New Trump Mark by Licensee, whether in signage, advertising, promotion, or otherwise, the phrase, "A Donald J. Trump Signature Property" shall follow immediately thereafter and shall consist of a type size not less than forty (40%) percent of the type size utilized for the New Trump Mark for each such use. Licensee shall also have the right to use the New Trump Mark in advertising, promotional and publicity materials for the promotion of the Building, then owned by Licensee, including but not limited to the required use of the phrase a Donald J. Trump Signature Property", as above-provided (the "**Marketing Right**"), subject to all the terms, covenants and provisions of this Agreement.  In connection with Licensee's exercise of the Marketing Right, Licensor reserves the right to prohibit the making of representations on behalf of Licensor (or Donald J. Trump, if no longer Licensor) or the use of material which, in the judgment of Licensor (or Donald J. Trump if no longer Licensor), do not accurately reflect facts about Licensor or Donald J. Trump. For the purposes of this subsection 1(a), "**exclusive**" shall mean that during the Term, and provided Licensee is not in default of this Agreement, after notice and the expiration of any applicable grace or cure period, Licensor shall not negotiate for, or deliver a license to, any individual or entity for the use of the New Trump Mark in connection with the promotion, sales, marketing, development and operation of any other residential or commercial property within Hillsborough County, Florida (the "**Territory**"), Nothing contained herein shall prohibit or restrict Licensor from utilizing, or authorizing any other person or entity to utilize the name "Trump", alone or in conjunction with any other words, to identify any other residential or commercial property, or otherwise, within the Territory), and elsewhere as long as such action shall not violate the immediately preceding sentence.  Licensor warrants that it has not granted and will not grant during the Term a license to any individual or entity, other than Licensee, to use the New Trump Mark in any manner in connection with real estate related goods or services within the Territory.  Provided Licensee is not in default of this Agreement, after notice and the expiration of any applicable grace or cure period, then until the first to occur of: (x) the closing of eighty-five (85%) percent of the condominium units in the Building that are offered for sale to the public; or (y) two (2) years after the first residential condominium unit closing in the Building, neither Licensor nor any affiliate of Licensor will directly or through any other entity act as a developer for any residential condominium building in the Territory.

(b)      Licensor hereby grants to Licensee, during the Term, the right to permit residential and retail occupants of the Building to use the New Trump Mark solely for the purpose of identifying the address of such occupants' location at the Building.  However, such right shall not permit the residential and retail occupants of the Building to use the New Trump Mark as part of the name or identification of such occupant.  For example, trade names such as "Trump Tower Tampa

3

Restaurant" or "The Restaurant at Trump Tower Tampa" are not permitted or authorized. The rights and restrictions governing such occupants' use of the New Trump Mark shall be set forth in the condominium offering plan or prospectus filed with respect to all or a portion of the Building ("**Plan**") and in any lease agreement between Licensee and such retail occupant, which Plan and lease terms governing such use, to the extent they relate to the use of the New Trump Mark, shall be subject to the approval of Licensor. Licensee agrees to cooperate fully with, and furnish assistance to Licensor in any action required, to ensure that any use of the New Trump Mark by such occupants complies with the terms and conditions of this Agreement. Notwithstanding anything to the contrary contained herein, Licensee shall not be liable for unauthorized uses of the New Trump Mark by residents, occupants and others that occur through no act or omission of Licensee.

(c)     Licensee may propose to adopt and/or use a certain logo or certain logos in association with the New Trump Mark,  including a logo or logos that substantially consists of distinctive design elements of the Building ("**Design Logo**"), in connection with the identification, sales and marketing and promotion of the Building (collectively, the "**Proposed Logo**" or "**Proposed Logos**"). Prior to any adoption and/or use of any kind by Licensee of any Proposed Logo, Licensee shall submit a graphical representation of such Proposed Logo(s) to Licensor precisely in the manner that Licensee intends such Proposed Logo(s) to appear in said commercial use. Following Licensee's submission of such Proposed Logo to Licensor, Licensor shall review such Proposed Logo within ten (10) business days of receipt thereof, and if such Proposed Logo(s) meet with Licensor's preliminary approval, Licensor shall, within ten (10) business days thereafter, commission its trademark counsel to conduct a full trademark search and make an assessment as to the likely registrability and/or availability of such Proposed Logo(s) for use. Licensor shall bear the costs incurred in the trademark clearance assessment of the first Proposed Logo other than Design Logos. Licensee shall bear the costs of any trademark clearance assessment beyond the first Proposed Logo and the registration costs of any Design Logo. Upon obtaining the assessment of counsel regarding clearance of any Proposed Logo(s) Licensor shall, in its reasonable discretion, within ten (10) business days of receipt of its trademark counsel's assessment of the Proposed Logo(s) determine whether to approve such Proposed Logo(s), which shall be delivered to Licensee. Licensor shall promptly notify Licensee in writing whether or not it is permitted to adopt and/or use any given Proposed Logo. However, in the event that Licensor does not deliver to Licensee such an approval or disapproval within ten (10) business days following issuance of Licensor's counsel's positive clearance assessment, Licensor shall be deemed to have issued an approval for Licensee to adopt and use the subject Proposed Logo(s). Except where Licensor's approval shall be deemed given as herein-above provided, Licensee shall not adopt and/or use any Proposed Logo(s) unless and until it obtains Licensor's approval, in writing, in the manner set forth in this subparagraph 1(c).

(d)     If the Licensor approves or is deemed to approve any Proposed Logo(s), such Proposed Logo(s) shall then be referred to as an "**Approved Logo(s)**". At such time that the Licensor approves or is deemed to approve any Proposed Logo(s), in writing, Licensee acknowledges and agrees that Licensor shall own all right, title and interest in and to any and all Approved Logos and that Licensee's sole rights with respect thereto shall be to have the "exclusive" (as defined in subsection 1(b)) right to use such Approved Logos subject to, and in accordance with, the terms, covenants and provisions of this Agreement. If and when any Proposed Logo is approved in writing (or deemed approved) by Licensor in accordance with the terms of this Agreement, such Proposed Logo (which

4

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa - 8-10-04v4 (F).doc

shall then constitute an Approved Logo hereunder) will be considered as of the date of such approval as a Trump Mark and will be subject to the terms and conditions of this Agreement. On termination of this Agreement, Licensor shall promptly assign to Licensee (in a form reasonably acceptable to Licensee) all of Licensor's right, title and interest in and to the Design Logo(s) adopted and used by Licensee, if any, but only that portion of such Design Logo(s) that do not contain any element of the original New Trump Mark or can be readily separated and clearly distinguished from the New Trump Mark, or are in the public domain.

(e)     If, during the Term, Licensee develops any Proposed Logo and Licensor approves or is deemed to have approved such Proposed Logo such that it becomes an "Approved Logo(s)", then Licensor will, at Licensee's expense, promptly file and prosecute an application for registration of such Approved Logo(s) at the U.S. Patent & Trademark Office (the "**PTO**").

2.     **Exclusions to License; Use of License; Licensor Marketing Assistance** (a) Except as otherwise provided herein, Licensee recognizes and agrees that no other rights to use the New Trump Mark are granted hereunder, whether as to activities, products, services, or otherwise. Accordingly, inter alia, Licensee has no right to use the New Trump Mark in connection with individual facilities within the Tower Property or the Building, or with any products or services sold or offered for sale in the Tower Property or the Building or elsewhere, except as provided in this Agreement, or if and as may subsequently be agreed to in writing by Licensor in Licensor's sole and absolute discretion.

(b)     Licensee also recognizes and agrees that it has no other rights to the use of the name "Trump" other than in respect to the licensed New Trump Mark, and recognizes Licensor's sole and exclusive ownership of all proprietary rights in the name "Trump" and in the New Trump Mark. Licensee will not register nor attempt to register the New Trump Mark or "Trump" or any derivations or phonetic equivalents thereof, as a name, mark or otherwise. Licensee agrees neither to assert any claim to any goodwill, reputation, or ownership of the name "Trump" or in the New Trump Mark nor to contest the validity or ownership of the New Trump Mark. Licensee agrees that it will not do, or permit any act or thing to be done, in derogation of any of the rights of Licensor in connection with Licensee's use of the New Trump Mark either during the Term or thereafter and that Licensee will not use the New Trump Mark except as licensed hereunder and as provided in this Agreement. Licensee further acknowledges and agrees that any goodwill associated with the use of the New Trump Mark shall inure directly and exclusively to Licensor.

(c)     All uses of the New Trump Mark by Licensee shall faithfully reproduce the design and appearance of the New Trump Mark.

(d)     At the request of Licensor, Licensee shall include the trademark designation legally required or useful for enforcement (e.g. "TM", "SM" or ®, as applicable) in connection with Licensee's use of the New Trump Mark.

(e)     Except as specifically authorized under this Agreement, Licensee shall not use the New Trump Mark in whole or in part on or in connection with any other business and shall not permit or authorize any other person or entity to use the New Trump Mark in any manner.

C:\Documents and Settings\Joe Degostino\My Documents\License - Tampa – 8-10-04v4 (3).doc

(f)     Licensor shall have the right to review and approve all promotional materials or any other materials using the New Trump Mark prior to Licensee's use of such material. Licensor shall use reasonable efforts to review and approve such material within fifteen (15) business days of its receipt of such material. Notwithstanding the foregoing, if Licensor shall fail to approve or disapprove (with constructive comments) any such promotional materials within twenty-five (25) days after submission to Licensor, Licensor's approval thereof shall be deemed given. Licensee shall not be required to obtain Licensor's approval for the use of materials substantially similar to the materials previously approved by Licensor. Notwithstanding the foregoing, in no event shall Licensee issue a press release concerning Licensor (or Donald J. Trump, if no longer Licensor) without Licensor's prior written approval, which shall not be unreasonably delayed, denied or subject to contingencies.

(g)     Licensee agrees to ensure that, in such cases as Licensor may require, use or display of the New Trump Mark are in the manner sufficient to indicate that the New Trump Mark is owned by Licensor and are being used under license. If Licensee uses the New Trump Mark in a manner specifically and previously approved by the Licensor in connection with the provisions of this Agreement, such use shall be deemed sufficient that the New Trump Mark are owned by Licensor and are being used under license.

(h)     Licensor agrees (or shall cause Donald J. Trump if no longer Licensor to agree) to make up to two (2) personal appearances at the Tower Property for no more than six (6) working hours each, on dates consistent with Licensor's (or Donald J. Trump's — if no longer Licensor) professional schedule, to assist in the marketing campaign for the Tower Property. If Licensor shall be unable to attend a personal appearance, as requested by Licensee, Licensor shall give Licensee three (3) alternative dates for such personal appearance, at least fifteen (15) business days in advance of such event.

3.     **Trump Standards; Confirmation of Compliance.** As a material inducement for Licensor's execution of this Agreement, Licensee covenants and agrees:

(a)     to design, develop, construct, equip and furnish the Tower Property with the level of quality and luxury associated with premier, first class, mixed-use residential condominiums located at recognized prime locations within the Borough of Manhattan, City of New York, (for example, as of the date hereof Trump Tower located at 725 Fifth Avenue, New York, New York and the residential portion of Trump International Hotel and Tower, located at One Central Park West, New York, New York (as of the date hereof, collectively the "**Signature Properties**"); and

(b)     at all times, to maintain, and ensure that all occupants referenced in Section 1(b) hereof, maintain, standards in connection with the ownership, operation and maintenance of the Tower Property, and all components thereof that are at least equal to those standards of ownership, operation and maintenance followed by the Signature Properties, as of the date hereof, (such standards of design, development, construction, equipment, furnishing, ownership, operation and maintenance provided in this Section 3, as of the date hereof, collectively the "**Trump Standards**").

(c)     Licensor shall, using his commercially reasonable judgment and discretion, be the sole judge of whether Licensee is maintaining the Trump Standards, and if Licensor, in his commercially reasonable judgment and discretion determines that the Trump Standards are not being

maintained or that Licensee has breached any other provision of this Agreement, (collectively, a "**Breach**") Licensor may notify Licensee thereof in writing (the "**Default Notice**") and if Licensee shall fail to fully correct to Licensor's satisfaction any condition or cure any other Breach identified in the Default Notice, within thirty (30) days of the date of such Default Notice, Licensor may immediately terminate this Agreement and all rights licensed hereunder by notifying Licensee in writing of such termination; provided however, that so long as the Breach cannot be cured solely by the payment of money and Licensee shall have commenced the curing of such Breach within such thirty (30) day period and shall diligently prosecute the curing thereof to completion, then Licensee shall have such reasonable additional period of time as shall be reasonably necessary to cure such Breach, but in no event more than sixty (60) days from the date of the Default Notice. Licensor shall not be required to send a Default Notice on more than three (3) occasions in any sixty (60) consecutive month period, during the Term, and in the event of a fourth (4th) Breach within such sixty (60) month period, Licensor may immediately terminate this Agreement and all rights licensed hereunder by notifying Licensee in writing of such termination.

(d)    Licensee shall deliver to Licensor all plans and specifications for the Building and interior and exterior components thereof, for Licensee's written confirmation that they comply with the Trump Standards, including but not limited to:

(i)    The engineering and design of the Building and all service systems of the Building;

(ii)    The exterior of the Building, including, but not limited to the façade, landscaping, access methods, and illumination;

(iii)    The unit layouts and room counts;

(iv)    All fixtures and appliances; and

(v)    The sales and marketing plan for the Tower Project, including sales office location and layout, sales staff training and sales collateral materials.

(e)    Subject to the terms, qualifications and conditions (the "**Trump Standards Requirements**") set forth on Exhibit B annexed hereto and made a part hereof, if any, Licensor hereby approves the preliminary plans and specifications (the "**Preliminary Plans**") for The Tower Property identified on Exhibit B. Within sixty (60) days of the date of this Agreement, Licensee shall, to the extent that there are Trump Standard Requirements that have not been satisfied or waived, deliver to Licensor its revised Preliminary Plans ("**Revised Preliminary Plans**") for Licensor approval, which satisfy the Trump Standards Requirements. Within fifteen (15) business days of receipt of the Revised Preliminary Plans, Licensor will either approve the same or send a "Deficiency Notice" (as herein defined) to Licensee, whereupon Licensee shall prepare and deliver to Licensor further Revised Preliminary Plans which satisfy the Deficiency Notice. In the event Licensor does not deliver to Licensee an approval or issue a Deficiency Notice within fifteen (15) business days of receipt of any Revised Preliminary Plans, Licensor shall be deemed to have approved the Revised Preliminary Plans.

7

(f) Prior to "commencing construction" (as herein defined) of the Tower Property, Licensee shall submit its final plans and specifications therefor (the "**Final Plans and Specifications**"), including each of the items delineated in Subsections 3d(i)-(v) hereof, to Licensor. Following Licensee's submission of such Final Plans and Specifications to Licensor, Licensor shall review such Final Plans and Specifications within fifteen (15) business days of receipt thereof. Within fifteen (15) business days after review of the Final Plans and Specifications, Licensor shall deliver a report to Licensee, which either: (a) approves, in writing, Licensee's Final Plans and Specifications or (b) identifies in detail and with particularity each portion of the Final Plans and Specifications that does not comply with the Trump Standard (the "**Deficiency Notice**") and specifies what changes need to be made to the Final Plans and Specifications before Licensor shall approve the Final Plans and Specifications. Licensee shall thereafter diligently attempt to cure such deficiencies, and upon completion, shall re-submit the revised Final Plans and Specifications to Licensor. Upon obtaining the revised Final Plans and Specifications, Licensor shall review the same, and within ten (10) business days after receipt thereof, shall either: (a) approve the revisal Final Plans and Specifications or (b) issue another Deficiency Notice. In the event that Licensor does not deliver to Licensee such an approval or Deficiency Notice within any fifteen (15) or ten (10) business day period, as the case may be, Licensor shall be deemed to have approved the Final Plans and Specifications. If the Parties reach an impasse such that the Revised Preliminary Plans or the Final Plans and Specifications are not approved by Licensor after Licensor issues three (3) or more Deficiency Notices (with respect to each of the Revised Preliminary Plans and the Final Plans and Specifications), then Licensee shall have the right to terminate this Agreement. Licensee may exercise such right of termination by delivering written notice to Licensor (the "**Termination Notice**") within, but not later than, fifteen (15) business days after the third Deficiency Notice, whereupon this Agreement shall automatically terminate and be of no further force or effect. Licensor shall be entitled to retain any portion of the License Fee paid to Licensor prior to the date of termination of this Agreement. Except as otherwise stated herein, Licensee shall not commence construction based upon the Final Plans and Specifications unless and until it obtains, or is deemed to have obtained Licensor's approval in the manner set forth herein. Licensee shall construct or cause construction of the Tower Property substantially in accordance with the Final Plans and Specifications, approved by Licensor, which shall adhere to and comply with the Trump Standards. For purposes of this Agreement, "**commencing construction**" shall mean the date of Licensee's (or its agent's) initiation of construction of the Building on the Land as evidenced by the commencement of excavation of the Building site.

(g) Licensor or its representatives shall have access ("**Licensor Access**") to the Tower Property and the interior of the Building, at any time and from time to time, during normal business hours, without notice, but without unreasonably interfering with the construction or operation of the Tower Property to confirm Licensee's compliance with the provisions of this Agreement.

(h) Licensee shall reimburse Licensor, within ten (10) days of Licensor's submission of a detailed invoice to Licensee, for transportation (business class or equivalent) accommodations and food expense incurred by Licensor or its representatives (not to exceed two (2) persons on any single visit, unless additional persons are requested by Licensee and consented to by Licensor) in connection with the exercise of Licensor's Access, on not more than (i) two (2) occasions in each twelve (12) consecutive month period from the date hereof to the issuance of a permanent certificate of occupancy for the Building, and (ii) one (1) occasion in each twelve (12) consecutive month period during the

8

balance of the Term. The provisions of this subparagraph (h) shall not be construed as a limit on the right of Licensor to exercise Licensor's Access.

4.    **Licensor's Consideration; Audit Rights.** (a) In consideration of the rights granted to Licensee herein, Licensee shall pay to Licensor, the "License Fee" and "Additional License Fee", as provided in Schedule 2 annexed hereto and made a part hereof.

(b)    Licensee will keep at its principal place of business in Tampa, Florida, full, complete and accurate original books of account and records from which the Additional License Fee is determined. Licensor and its authorized representative(s) shall have the right to examine and make copies of such books of account and records and other documents and material in Licensee's possession or under its control with respect to its determination of the Additional License Fee. The Licensor and its representative(s) shall have free and full access thereto for such purpose and for the purpose of making extracts therefrom, including making copies of such books of account and records, at all reasonable hours of the day during which Licensee's offices are open. Licensee shall preserve such books of account, records, documents and material for a period of two (2) years after the expiration or earlier termination of this Agreement and Licensor may examine said books of account and records during such two (2) year period.

5.    **Term.** The term of this Agreement ("**Term**") shall commence on the date hereof (the "**Commencement Date**") and shall end on the day preceding the twentieth (20th) anniversary of the Commencement Date (the "**Expiration Date**"). Provided that on the Expiration Date, and on each "Successor Expiration Date" (as herein defined), Licensee is not in default of this Agreement after notice and the expiration of any applicable cure period, this Agreement shall be deemed renewed for additional successive terms of twenty (20) years each, commencing on the day following the then applicable expiration date (the "**Successor Expiration Date**").

6.    **Licensor's Termination.** Notwithstanding anything to the contrary contained herein, in addition to any other right or remedy of Licensor hereunder, Licensor shall have the absolute right to terminate this Agreement and the rights licensed hereunder, upon ten (10) days prior written notice of such termination to Licensee, if:

(a)    Licensee files a petition in bankruptcy or is adjudged bankrupt; or

(b)    A petition in bankruptcy is filed against Licensee and not discharged within sixty (60) days; or

(c)    Licensee becomes insolvent, or makes an assignment for the benefit of its creditors or any arrangement pursuant to any bankruptcy or like law; or

(d)    A receiver is appointed for Licensee or its business; or

(e)    A substantial portion of the Building is damaged or destroyed by fire or other casualty and the Building is not rebuilt in a diligent and expeditious manner and in compliance with the Trump Standards; or

9

(f)    The Building or any part thereof is taken in condemnation or eminent domain proceedings and the remaining portions of the Building and land upon which it is located cannot be operated in a manner consistent with the Trump Standards; or

(g)    The construction of the Building shall fail to commence within eighteen (18) months from the date of this Agreement, unless such delay shall result from any strikes, lockouts or labor disputes, inability to obtain labor or materials or reasonable substitutes therefor, acts of God, governmental restrictions, regulations or controls, enemy or hostile government action, civil commotion, riot or insurrection, fire or other casualty or other events similar to the foregoing beyond the reasonable control of Licensee (collectively, "**Unavoidable Delays**"), in which event such eighteen (18) month period shall be deemed extended one (1) day for each day of contemporaneously documented Unavoidable Delay; or

(h)    A permanent certificate of occupancy (or local governmental equivalent) has not been issued for the Building within thirty-six (36) months from filing of the Notice of Commencement of construction, except as a result of Unavoidable Delays, in which event, such thirty-six (36) month period shall be deemed extended one (1) day for each day of Unavoidable Delay, which is contemporaneously documented to Licensor; or

(i)    Closings for at least seventy (70%) percent of the residential condominium units of the Building have not occurred or such units are not under bona fide binding purchase contracts, within thirty (30) months from the Commencement Date, except as a result of Unavoidable Delays, in which event, such thirty (30) month period shall be deemed extended one (1) day for each day of Unavoidable Delay, which is contemporaneously documented to Licensor.

7.    **Licensee's Termination**.  Licensee shall have the right to terminate this Agreement upon ten (10) days prior written notice of such termination to Licensor if (i) prior to the date that at least seventy-five (75%) percent of the units in the Building have closed title or are subject to binding purchase contracts, Licensor (or Donald J. Trump, if no longer Licensor) is convicted of a felony; or (ii) Licensee fails to register and maintain the registration of the New Trump Mark during the Term.

8.    **Discontinuation of Use of Marks**.  Upon the termination of this Agreement for any reason, Licensee will immediately undertake its best efforts to discontinue any and all uses of the New Trump Mark, and make no further use of the same whatsoever. If Licensee fails to so discontinue all such use within thirty (30) days, Licensor shall be entitled to immediate injunctive relief in addition to damages and all other applicable remedies.

9.    **Indemnification; Insurance**  (a) <u>By Licensee</u>.  Licensee hereby agrees to indemnify, defend, and hold free and harmless Licensor, its members, shareholders, employees, representatives,

directors, officers, legal representatives, successors and assigns from and against any and all causes of action (including without limitation product liability and tort actions) and reasonable out-of-pocket expenses, including, without limitation, interest, penalties, attorney and third Party fees, and all reasonable amounts paid in the investigation, defense, and/or settlement of any claims, suits, proceedings, judgments, losses, damages, costs, liabilities and the like (individually and collectively, "**Claims**"), which may be suffered, incurred or paid by Licensor arising in whole or in part, directly or indirectly, from or out of (i) Licensee's performance under this Agreement (including, but not limited to, any Claim relating to the design, construction, maintenance and operation of the Building) or (ii) any trademark infringement action, proceeding or claim, or threat of such action, proceeding or claim, arising from Licensee's use of the New Trump Mark in violation of this Agreement or its use of the Design Logos or any trademarks not approved by Licensor.

(b) **By Licensor.** Licensor hereby agrees to indemnify, defend, and hold free and harmless Licensee, its members, shareholders, employees, representatives, directors, officers, legal representatives, successors and assigns from and against any and all Claims which may be suffered, incurred or paid by Licensee arising in whole or in part, directly or indirectly, solely from or out of Licensee's use or authorization for others to use (in accordance with the provisions of this Agreement) the term "Trump Tower" as part of the New Trump Mark. The provisions of this Section 9(b) shall not apply to Claims relating to any part of the Trump Mark other than the name "Trump". The provisions of this Section 9(b) shall not apply to Claims relating to any part of the New Trump Mark or Design Logo(s) other than the name "Trump".

(c) Prior to the commencement of construction of the Tower Property, Licensee shall obtain, at Licensee's expense, extended coverage and all-risk insurance upon the Tower Property in amounts and with insurers reasonably acceptable to Licensor. Licensee agrees that Licensor shall be named as an additional insured with respect to Licensee's aforesaid liability insurance policies (and Donald J. Trump, if not Licensor) at no cost to Licensor and that such policies shall provide that they may not be cancelled without at least thirty (30) days' prior written notice to Licensor, and Licensee shall, prior to the commencement of construction, provide to Licensor, certificates of insurance evidencing such coverage, together with a statement by Licensee that, to the best knowledge of Licensee, said insurance is in full force and effect and the premiums therefor have been paid.

(d) The provisions of this Paragraph 9 shall survive the expiration or termination of this Agreement.

10. **Assignment.** (a) Except for the provisions of subparagraph 2(h) hereof, Licensor may assign this Agreement without the prior consent of Licensee to a "Related Party" (as herein defined) provided the assignee assumes the terms and conditions of this Agreement and owns or controls the New Trump Mark. Except for an assignment of this Agreement as provided in the immediately preceding sentence, any assignment of this Agreement by Licensor shall require the consent of Licensee, not to be unreasonably withheld, delayed or subject to contingencies. For the purposes of this Paragraph 10, a "**Related Party**" shall mean any person who directly or indirectly, controls, is controlled by, or is under common control with, the proposed assignor, and "**control**" shall mean ownership of more than fifty (50%) percent of all the voting stock of a corporation or more than fifty (50%) percent of all the legal and equitable interests in another type of legal entity and the power to control its day to day affairs. This Agreement and Licensee's use of the New Trump Mark hereunder

11

shall inure solely to the benefit of Licensor and to any and all heirs, successors or permitted assignees of Licensor who owns or controls the New Trump Mark.

(b)   Licensee may assign this Agreement without the written consent of Licensor only to a duly established condominium Board of Managers pursuant to the Plan, which Board of Managers shall assume (on behalf of all unit owners of the condominium), in a writing delivered to Licensor (which writing shall be subject to Licensor's approval (not to be unreasonably withheld or delayed)), all of Licensee's obligations hereunder; provided, that the Board of Managers shall not be required to assume Licensee's payment obligations pursuant to Section 4 hereof.  Notwithstanding the foregoing, (x) no such assignment by Licensee shall include an assignment of the Marketing Right, and the original named Licensee hereunder shall retain the Marketing Right, so long as the original named Licensee shall own units in the Building that are being offered for sale to the public, subject to the terms and provisions of this Agreement (including, without limitation, the provisions of Section 1(a) hereof), and (y) no such assignment by Licensee shall relieve the original named Licensee from its obligations under this Agreement.

11.   **Infringement**  (a) If during the Term any trademark infringement action, proceeding or claim, or threat of such action, proceeding or claim, based solely on the use of the term "Trump" as part of the New Trump Mark or any Design Logo(s) pursuant to the terms of this Agreement, is instituted against Licensee, Licensor hereby agrees, subject to the other provisions of this Section 11(a) to indemnify, defend, and hold free and harmless Licensee, its directors, officers, successors, legal representatives, and assigns from and against any and all such causes of action, damages, penalties and reasonable out-of-pocket expenses, including, without limitation, interest, penalties, attorney and third Party fees which may be suffered, incurred or paid by Licensee with respect thereto. Licensee agrees to cooperate with Licensor in the defense of such action and to take no actions of any kind regarding such claim without the express prior written consent of Licensor.  Licensor shall have the sole and absolute right to settle any such action and to negotiate and determine the settlement terms. Licensee shall take all steps reasonably recommended to mitigate its damages incurred, including the removal of any New Trump Mark and Design Logos from the Tower Property and discontinuance of any use of the New Trump Mark and Design Logos to the extent they include the term "Trump", if required by Licensor. The remedy provided in this paragraph shall be the sole and entire remedy of Licensee, and Licensor shall not be responsible for any other damages of any kind, including special or consequential damages or projected lost sales or profit of Licensee or other expenditures of Licensee.  Licensee shall promptly notify Licensor of any marks used by third parties that may be confusingly similar or otherwise damaging to the New Trump Mark, but shall take no other action of any kind with respect thereto, except by express prior written authorization of Licensor.

(b)   If during the Term any trademark infringement action, proceeding or claim, or threat of such action, proceeding or claim, based on use of the New Trump Mark (exclusive of any Design Logo(s)s) is instituted against Licensor, Licensor shall have, at Licensor's option, the right to: (i) defend itself against any such action, proceeding or claim; or (ii) enter into any settlement of any such action, proceeding or claim in its sole discretion.

12.   **Representations and Warranties.**  (a) Licensor represents and warrants to Licensee that:

12

(i)     This Agreement constitutes a legal, valid and binding obligation of Licensor, enforceable against Licensor in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(ii)     Licensor shall use commercially reasonable efforts to obtain a PTO registration for the New Trump Mark, and to maintain in full force and effect, at its expense, the New Trump Mark.

(iii)     The New Trump Mark is free and clear of any and all liens and other encumbrances arising from Licensor's acts or omissions and will not be pledged or granted as a security interest during the Term unless such pledge or security interest is subject to this Agreement.

(b)     Licensee represents and warrants to Licensor that:

(i)     Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida. Licensee has the power and authority and all licenses, authorizations, consents and approvals to perform its obligations under this Agreement.

(ii)     The execution, delivery and performance by Licensee of this Agreement has been duly authorized by all necessary corporate action, and does not and will not contravene the terms of Licensee's articles of organization or Operating Agreement, conflict with, or result in any breach or contravention of, any contractual obligation to which Licensee is a Party or any order, injunction, writ or decree of any governmental authority to which Licensee or its property is subject or violate any requirement of law.

(iii)     This Agreement constitutes legal, valid and binding obligations of Licensee, enforceable against Licensee in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

**13.**    **Notices.** Any notice, election, request or demand which by any provision of this Agreement is required or permitted to be given or served hereunder shall be in writing and shall be given or served by (i) hand delivery against receipt; or (ii) by any nationally recognized overnight courier service providing evidence of the date of delivery; or (iii) by certified mail return receipt requested, postage prepaid; or (iv) by facsimile transmission, provided it is also concurrently sent by mail as provided in (iii) above, in each case addressed to:

(a)     Licensee:

Simdag/Robel, LLC
102 West Whiting Street
Tampa, FL 33602
Attention: Jody Simon
        Managing Partner

With a copy to:     Stearns Weaver Miller Weissler Alhadeff & Sitterson

Attention: Ronald L. Weaver
401 East Jackson Street, Ste. 2200
Post Office Box 3299 → *P.o. Box* ⇒ *no P.o Box*
Tampa, FL 33601 ⌐ *use*
Fax:     (813) 222-5089 *mjo 33602*
*Phone 813-222-5002.*

and

(b)     Licensor:

Donald J. Trump
Chairman
c/o The Trump Organization LLC
725 Fifth Avenue
New York, New York 10022
Fax:     (212) 755-3230

With a copy o:

The Trump Organization LLC
725 Fifth Avenue
New York, New York 10022
Attention: General Counsel
Fax:     12)-317-0037

or to such other address or addresses, or such other persons, as a Party shall from time to time designate by notice given and delivered as aforesaid. Any notice shall be deemed to have been rendered or given: (w) on the date hand delivered (or when delivery is refused), unless such hand delivery was not on a business day or was after 5:30 p.m. on a business day, in which event delivery shall be deemed to have been rendered on the next business day; (x) on the date delivered by a courier service (or when delivery is refused), unless such delivery was not on a business day or was after 5:30 p.m. on a business day, in which event delivery shall be deemed to have been rendered on the next business day; (y) three (3) business days from the date deposited in the mail, if mailed as aforesaid; and (z) the date sent by facsimile transmission, provided a copy is concurrently sent in the manner provided in subsection (ii) above.

14

14. **Brokerage.** Licensor and Licensee covenant, warrant and represent to the other that there was no broker or finder, except Roman Osadchuk and RPO Realtors (collectively , the "Broker"), instrumental in consummating this Agreement and that no conversations or negotiations were had with any broker or finder, except the Broker, concerning the terms of this Agreement. Licensee shall be solely responsible for any commissions, fees or other compensation (collectively, "Fees") due to Broker. Licensor and Licensee agree to indemnify, defend, save and hold the other Party harmless from and against any claims or suits for Fees arising from its breach of the covenants, warranties and representations made by it in this Paragraph 14. The provisions of this paragraph will survive the expiration or termination of its Agreement.

15. **Confidentiality.** Licensor and Licensee covenant and agree that, without the written consent of the other Party, unless required by law, they will not, under any circumstances, disclose or permit to be disclosed the existence of this Agreement or any of its contents, to any persons or entities for any purpose whatsoever, other than solely to their respective shareholders, directors, members, officers and other employees, attorneys and accountants (collectively, "**Affiliated Parties**"), in each such case, on a "need to know basis". All Affiliated Parties shall be deemed bound by the provisions of this Paragraph 15. In connection with any such permitted disclosure to any Affiliated Parties, Licensor and Licensee, as applicable, shall be liable to the other Party for the acts or omissions of their Affiliated Parties that are in violation of this Paragraph 15.

16. **Miscellaneous.** (a) This Agreement shall be governed, both as to interpretation and enforcement, by the laws of the State of New York and, as necessary, in the courts in that State, without regard to any principles of conflicts of law.

(b) Notwithstanding anything to the contrary contained herein, including but not limited to the provisions of Paragraph 3 hereof, Licensor shall not be responsible for and shall have no liability to Licensee or to any third parties for, any design or construction means, methods, techniques, sequences and procedures, or for safety precautions and programs, employed by or on behalf of Licensee with respect to the design and construction of the Building. It is further understood and agreed by Licensee that Licensor is not an architect, engineer, contractor or other professional licensed by any state, city or municipal authority or any department or agency of any of the foregoing, and Licensor shall provide no services to Licensee in such capacity and shall have no liability to Licensee or to any third Party as such. Any reviews, recommendations, approvals, and advice to be furnished by Licensor under this Agreement shall not be deemed to be warranties or guarantees or constitute the performance of professional services as aforesaid.

(c) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

(d) If any provision hereof, or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remaining provision herein, or the application of such provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.

(e) This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and may not be amended except by an instrument in writing signed

15

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa - 8-10-04wl (3).doc

by a Licensor and Licensee. Failure of a Party hereto to complain of any act, omission, course of action, or continued acts or omissions, no matter how long such may continue, shall not be deemed a waiver by said Party of its rights hereunder, and all waivers of the provisions hereof shall be effective only if in writing, signed by the Party so waiving. No waiver of any breach of this Agreement shall be deemed a waiver of any other breach of this Agreement or a consent to any subsequent breach of this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the dates and at the places set forth below effective as of the date first set forth above.

**LICENSOR**

DONALD J. TRUMP

**LICENSEE**

SIMDAG/ROBEL, LLC

By:   W & A LLC,
        a Florida limited liability license, its Manager

By:

Jody Simon, Managing Member

By:

Dr. Howard Howell, DDS, Member

16

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa - 8-10-04(v4 (3).doc

## EXHIBIT A

## PROPERTY

**(Exhibit follows this cover page)**

KL3:2176705.1

*Petitioner*

ORDINANCE NO. 2004- **178**

AN ORDINANCE REZONING PROPERTY IN THE GENERAL VICINITY OF 103 SOUTH ASHLEY DRIVE, IN THE CITY OF TAMPA, FLORIDA, AND MORE PARTICULARLY DESCRIBED IN SECTION 1, FROM ZONING DISTRICT CLASSIFICATION(S) CBD-2 (VACANT & OFFICE) TO CBD-2 (MIXED USE-RESIDENTIAL MULTI-FAMILY/RETAIL/COMMERCIAL/OFFICE); PROVIDING AN EFFECTIVE DATE.

WHEREAS, a public hearing as required by law was held in City Council Chambers, Third Floor, City Hall, 315 East Kennedy Boulevard, in the City of Tampa, Florida, relating to the rezoning of the real estate described in Section 1 of this ordinance under the terms and provisions of Chapter 27, City of Tampa Code.

NOW, THEREFORE,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF TAMPA, FLORIDA:

Section 1. That the Zoning District Classification upon the following described real estate, situate, lying and being in the City of Tampa, County of Hillsborough and State of Florida, more particularly described as follows:

LEGAL DESCRIPTION:   (Attached hereto and made a part hereof as Exhibit A);

which is presently zoned CBD-2 (Vacant & Office) under City of Tampa Code Chapter 27, be changed to ZONING DISTRICT CLASSIFICATION CBD-2 (Mixed use-residential multi-family/retail/commercial/office), as provided for in Chapter 27, City of Tampa Code, and that the zoning map be amended to reflect said change on the above-described legal description and all information shown thereof shall be as much a part of this ordinance as if such information set forth on said zoning map of the City of Tampa was all fully described and set out herein.

Section 2. That said Zoning District Classification is hereby amended and to be controlled by a site development plan dated 06/30/04, a copy of which is attached hereto and by reference made a part hereof as Exhibit B.

Section 3. That approval of this rezoning shall not release the Petitioner/Owner from meeting the requirements of the City of Tampa's

Concurrency Management System Ordinance at the time of actual permitting and development of the rezoned site.

Section 4. That the approval of said rezoning shall not release the Petitioner/Owner from meeting all other applicable sections of the City of Tampa Code, as such sections relate to the actual permitting and development of the rezoned site.

Section 5. That all ordinances in conflict herewith are repealed to the extent of any conflict.

Section 6. That if any part of this ordinance shall be declared unconstitutional or invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

Section 7. That this ordinance shall take effect immediately upon becoming a law.

PASSED AND ORDAINED BY THE CITY COUNCIL OF THE CITY OF TAMPA, FLORIDA ON **JUL 29 2004**.

ATTEST:

_____
CHAIRMAN/CHAIRMAN PRO-TEM,
CITY COUNCIL

_____
CITY CLERK/DEPUTY CITY CLERK

AUG 0 2 2004

APPROVED by me on _____

PREPARED BY AND APPROVED
AS TO LEGAL SUFFICIENCY:

_____
PAM IORIO, MAYOR

_____
MORRIS C. MASSEY
ASSISTANT CITY ATTORNEY

Z04-81

City of Tampa
Right of Way & Mapping Section
LEGAL DESCRIPTION APPROVED

Date: 4/7/04 File No. 324-81

Files: I-13 By: /s/

LEGAL DESCRIPTION (DO NOT ABBREVIATE):

WATER LOTS 12, 13, 14 AND 15, HENDRY & KNIGHT'S MAP OF THE GARRISON, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 2, AT PAGE 73, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA; AND ACCORDING TO BOUNDARY SURVEY DATED JANUARY 11, 1954, BY ALAN B. PIMM, REGISTERED SURVEYOR No. 480, BEING ATTACHED TO AND BY REFERENCE A PART OF AGREEMENT RECORDED IN DEED BOOK 1793, PAGE 424, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA; AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF WATER LOT 12 OF HENDRY AND KNIGHT'S MAP OF THE GARRISON, ACCORDING TO MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 2, PAGE 73, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA; RUN THENCE SOUTH 18 DEGREES 11 MINUTES 18 SECONDS EAST, ALONG THE EASTERLY BOUNDARY OF WATER LOTS 12, 13, AND 14 OF SAID HENDRY AND KNIGHT'S MAP OF THE GARRISON (WESTERLY BOUNDARY OF WATER STREET OR SOUTH ASHLEY DRIVE), FOR 149.91 FEET TO THE NORTHEAST CORNER OF WATER LOT 15, OF SAID HENDRY AND KNIGHT'S MAP OF THE GARRISON, THENCE SOUTH 9 DEGREES 38 MINUTES 18 SECONDS EAST, ALONG THE EASTERLY BOUNDARY OF SAID WATER LOT 15 (WESTERLY BOUNDARY OF WATER STREET OR SOUTH ASHLEY DRIVE) FOR 58.35 FEET TO THE SOUTHEAST CORNER OF SAID WATER LOT 15 PER AGREEMENT RECORDED IN DEED BOOK 1793, AT PAGE 424, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA; THENCE SOUTH 69 DEGREES 02 MINUTES 42 SECONDS WEST, ALONG THE SOUTHERLY BOUNDARY OF SAID WATER LOT 15 PER SAID AGREEMENT, FOR 179.10 FEET TO THE COMBINED PEIRHEAD AND BULKHEAD LINE ON THE EASTERLY SIDE OF THE HILLSBOROUGH RIVER AS DESIGNATED ON MAP OF "U.S. HARBOR LINES, TAMPA HARBOR FLORIDA, HILLSBOROUGH RIVER AND HILLSBOROUGH BAY", APPROVED JANUARY 19, 1953; THENCE NORTH 9 DEGREES 45 MINUTES 48 SECONDS WEST, ALONG SAID COMBINED PIERHEAD AND BULKHEAD LINE FOR 209.09 FEET; THENCE NORTH 69 DEGREES 05 MINUTES 42 SECONDS EAST, ALONG THE NORTHERLY BOUNDARY OF SAID WATER LOT 12, FOR 156.82 FEET TO THE POINT OF BEGINNING.

AND

WATER LOTS 16, 17 AND 18, HENDRY & KNIGHT'S MAP OF THE GARRISON, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 2, AT PAGE 73, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA; LESS THE FOLLOWING DESCRIBED PORTION OF LOT 18:

A PART OF WATER LOT 18 IN HENDRY & KNIGHT'S MAP OF THE GARRISON, AS PER MAP OR PLAT THEREOF RECORDED IN PLAT BOOK 2, AT PAGE 73, OF THE PUBLIC RECORDS OF HILLSBOROUGH COUNTY, FLORIDA, DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHEAST CORNER OF SAID WATER LOT AND RUN WESTERLY ALONG THE SOUTHERLY BOUNDARY LINE THEREOF A DISTANCE OF 46.36 FEET TO A POINT; THENCE NORTHEASTERLY ON A LINE MAKING AN ANGLE 175°09' TO THE RIGHT A DISTANCE OF 46.46 FEET TO A POINT ON THE EASTERLY BOUNDARY OF SAID WATER LOT; THENCE SOUTHERLY ALONG THE SAID EASTERLY BOUNDARY LINE A DISTANCE OF 3.12 FEET TO THE POINT OF BEGINNING.

EXHIBIT "A"

C:\Documents and Settings\Joe Dagostino\My Documents\License - Tampa - 3-10-04v4 (3).doc

## EXHIBIT B

## PRELIMINARY PLANS

The architectural schematic design plans, elevations, renderings and study model photographs of Smith/Barnes Santiesteban Architects dated March 3, 2004.

### THE TRUMP STANDARDS REQUIREMENTS

### EXCEPTIONS TO LICENSOR'S APPROVAL OF PRELIMINARY PLANS AND SPECIFICATIONS

1. The design of the lobby will be modified in accordance with ongoing discussions between Licensor and Licensee.

2. Licensor and Licensee will discuss alternative unit layouts to enhance the marketability of unit offerings.

## SCHEDULE 1

## CERTAIN TRADEMARK REGISTRATIONS OF LICENSOR

| TRADEMARK | REGISTRATION NUMBER | CLASSIFICATIONS |
|-----------|---------------------|-----------------|
| Trump Tower | 1,688,083 | 36 |

KL3:2176705.1

C:\Documents and Settings\Joe Dagostino\My Documents\License – Tampa – 8-10-04v4 (3).doc

## SCHEDULE 2

## LICENSE FEES

1. <u>License Fee</u>.

   Licensee shall pay to Licensor for the license of the Trump Marks, as herein provided, a non-fundable license fee ("**License Fee**") of $2,000,000.00 payable as follows:

   (a) $125,000.00 upon the execution of this Agreement;

   (b) $125,000.00 upon Licensor's approval of the Preliminary Plans and Specifications; and

   (c) $1,750,000.00 in twenty-six (26) consecutive monthly installments (the "**Installments**") of $65,000.00 each and a final monthly installment of $60,000.00, in each case on the first day of each such month, commencing on the ninetieth (90th) day next succeeding the date on which the payment referred to in subparagraph 1(b) immediately above is made; and

   (d) Notwithstanding the provisions of subparagraph (b) above, any unpaid Installments existing on the date of issuance of the Temporary Certificate of Occupancy (or local equivalent) for the residential portion of the Building shall accelerate and be immediately due and payable to Licensor.

2. <u>Additional License Fee</u>. In addition to the License Fee, Licensee shall pay to Licensor additional fees (collectively the "**Additional License Fee**") as follows:

   (a) If the average gross sales prices of the residential condominium units in the Building as of the "Payment Date" (as herein defined) exceed $300 per square foot (inclusive of all bathroom and kitchen fixtures and equipment) (using the square foot designations for each unit set forth in the condominium offering plan for the subject condominium Building, or if not so set forth in the Plan, then as certified by Licensee's architect or surveyor), Licensee shall pay to Licensor, as an Additional License Fee, an amount equal to:

      (i) Five (5%) percent of the amount by which the average gross sales prices equal or exceed $300.00 per square foot and are less than $350.00 per square foot; and

      (ii) Ten (10%) percent of the amount by which the average gross sales prices equal or exceed $350.00 per square foot and are less than $450.00 per square foot; and

      (iii) Twenty-five (25%) percent of the average gross sales prices in excess of $450.00 per square foot.

    (iv)    The Additional License Fee shall be computed and paid on the date (the **"Payment Date"**) which is the first to occur of:

        (x)    the closing of eighty-five (85%) percent of the condominium units in the Building offered for sale to the public; or

        (y)    two (2) years after the date when the first residential condominium unit in the Building closes.

    (v)    On the Payment Date, an Additional License Fee in respect of all unsold condominium units in the Building shall be inferred (from an extrapolation of the average sales prices as of the Payment Date), and the applicable Additional License Fee shall be paid to Licensor, for any such unsold units or as of the Payment Date.

(b) So long as this Agreement is in effect, if the average annual square foot rent (on a rentable square foot basis) for any retail space in the Building equals or exceeds $20.00 per square foot, then on a quarter-annual basis, Licensee shall pay to Licensor an amount equal to ten (10%) percent of the excess.

## Index of Terms

Additional License Fee .......................................................................................... 20
Affiliated Parties ..................................................................................................... 15
Agreement ................................................................................................................. 2
Approved Logo(s) ...................................................................................................... 7
Breach ...................................................................................................................... 15
Broker ........................................................................................................................ 2
Building ..................................................................................................................... 11
Claims ........................................................................................................................ 9
Commencement Date ................................................................................................. 8
commencing construction .......................................................................................... 12
control ......................................................................................................................... 7
Default Notice ............................................................................................................. 8
Deficiency Notice ....................................................................................................... 4
Design Logo ................................................................................................................ 3
exclusive ..................................................................................................................... 9
Expiration Date ......................................................................................................... 15
Fees ............................................................................................................................. 8
Final Plans and Specifications ................................................................................. 20
Installments ................................................................................................................ 2
Land ........................................................................................................................... 20
License Fee .................................................................................................................. 2
Licensee ...................................................................................................................... 2
Licensor ....................................................................................................................... 8
Licensor Access .......................................................................................................... 3
Marketing Right .......................................................................................................... 2
New Trump Mark ........................................................................................................ 2
Parties .......................................................................................................................... 2
Party .......................................................................................................................... 21
Payment Date .............................................................................................................. 4
Plan .............................................................................................................................. 4
Proposed Logo ............................................................................................................ 4
Proposed Logos ........................................................................................................... 5
PTO ............................................................................................................................ 12
Related Party ............................................................................................................... 7
Revised Preliminary Plans .......................................................................................... 6
Signature Properties .................................................................................................... 9
Successor Expiration Date ........................................................................................... 9
Term ............................................................................................................................. 8
Termination Notice ...................................................................................................... 3
Territory ....................................................................................................................... 2
Tower Property ............................................................................................................ 6
Trump Standards .......................................................................................................... 6
Trump Standards Requirements ................................................................................... 7
Unavoidable Delays ................................................................................................... 10

L:\BRD\Tampa\First Amend to License Agt. FINAL on 4-11-06.doc

## FIRST AMENDMENT TO LICENSE AGREEMENT

This First Amendment to License Agreement ("First Amendment"), effective as of March 31, 2006, is made to that certain License Agreement dated October 27, 2004 ("Agreement"), between DONALD J. TRUMP ("Licensor"), whose principal place of business is at 725 Fifth Avenue, New York, New York 10022, and SIMDAG/ROBEL, LLC, a Florida limited liability company ("Licensee") whose principal place of business is at 102 West Whiting Street, Tampa, Florida 33602.

WHEREAS, the parties hereby agree to amend the Agreement as specifically set forth herein, with all other terms and conditions not amended hereby remaining in full force and effect.

NOW, THEREFORE, in and for the consideration of Ten Dollars ($10.00) in hand paid, and for other good and valuable consideration, including the consideration set forth in the Agreement, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     The parties acknowledge and agree that <u>Schedule 2</u> ("License Fees") is hereby amended as follows:

a.     In Section 1 (<u>License Fee</u>), the amount of "$2,000,000.00" is changed to "$4,000,000.00".

b.     Section 1 is further revised to delete subsection (c) in its entirety and replace it with the following:

(c)  $2,840,000.00 in twenty-two (22) consecutive monthly installments (the "installments") of $129,091.00, in each case on the first day of each such month, commencing on April 1st 2006 (Licensee acknowledges that it has already been paid the sum of $1,160,000.00 by Licensor, as of the date hereof); and

c.     Section 2 (<u>Additional License Fee</u>) is hereby deleted in its entirety and replaced with the following:

2.     <u>Additional Licensee Fee.</u>     In lieu of any previous agreements between the parties relating to payment of a percentage of average gross sales prices, the parties agree that Licensee shall pay to Licensor as additional license fees ("<u>Additional License Fee</u>") an amount equal to fifty percent (50%) of the "Net Sales Profit" (as hereinafter defined) of the Project. The parties hereby intend that Licensee and Licensor shall share equally (50% and 50%) in the Net Sales Profit, provided that Licensee shall receive a credit against such amount for all fees paid by Licensee during the term of this Agreement (that is, for the License Fee paid). By way of example, if the Net Sales Profit of the Project is $20,000,000.00, and Licensee has paid to Licensor a total License Fee of $4,000,000.00 (as provided in Section 1, above) during the term of the Agreement, then

1

L:\BRD\Tampa\First Amend to License Agt FINAL on 4-11-06.doc

Licensee shall remit to Licensor and Licensor shall accept as full payment of the Additional License Fee, the sum of $6,000,000.00 (calculated by dividing the $20,000,000.00 of Net Sales Profit by two (2), and subtracting therefrom the License Fee of $4,000,000.00 paid by Licensee to Licensor).

a. The term "Net Sales Profit" shall mean the aggregate gross sales prices of all Commercial Units, Garage Units and Residential Condominium Units at the Project (collectively, the "Units"), less the following (collectively, the "Deductible Expenses"):

(i) usual and customary closing costs,

(ii) construction financing loans and loans from equity members directly applied to the development of the Project (collectively, the "Debt"); and

(iii) the Project Expenses as provided on **Exhibit A** annexed hereto and made a part hereof. Notwithstanding the foregoing, all Deductible Expenses shall be based upon arms-length negotiations with third-parties and shall be competitive with prices for comparable projects in southern Florida.

No other fees or payments shall be paid or otherwise due from Licensee to Licensor, except for the License Fee and the Additional License Fee.

b. For information purposes, attached hereto as **Exhibit B** is a "Schedule of Approved Sales" listing projected sales prices for each Unit.

c. The Additional License Fee shall be made promptly following the date when a sufficient number of the Units in the Building have closed and the proceeds thereof result in full repayment of all Debt (the "Debt Repayment Date"). Following the Debt Repayment Date, Licensee shall remit to Licensor fifty percent (50%) of Net Sales Profit within two (2) business days following bank clearance of Licensee's net proceeds from each Unit closing that thereafter occurs, which, at Licensor's option will be made by wire transfers and/or checks disbursed and sent via overnight courier.

2. The parties acknowledge that, as of the date hereof, no notices have been delivered alleging any defaults by either party.

3. The remaining terms and provisions of the Agreement shall remain in full force and effect and shall not be amended, except in accordance with the terms and provisions set forth herein.

[Signatures follow on the next page.]

2

L:\BRD\Tampa\First Amend to License Agt FINAL on 4-11-06.doc

IN WITNESS WHEREOF, the parties have executed this First Amendment effective as of the date first set forth above.

LICENSOR

Donald J. Trump

LICENSEE:

SIMDAG/ROBEL, LLC
a Florida limited liability company

By:
Print Name: Frank Dagostino
Print Title: CEO

3

# Exhibit A

3/29/2006

Trump Towers Tampa
Tampa, FL

| | | Total Budget | Actual |
|---|---|---|---|
| **LAND ACQUISITION** | | | |
| Land Costs | | 13,000,000.00 | 13,000,000.00 |
| Additional Land Costs | | 3,120,000.00 | 3,120,000.00 |
| | Subtotal | 16,120,000.00 | 16,120,000.00 |
| **G&A (LEGAL,ENVRNMNTL)** | | | |
| Legal Fees | | 1,200,000.00 | 1,200,000.00 |
| Loan Closing Costs | | 500,000.00 | 500,000.00 |
| | Subtotal | 1,700,000.00 | 1,700,000.00 |
| **APPRAISAL** | | | |
| Appraisal | | 50,000.00 | 50,000.00 |
| | Subtotal | 50,000.00 | 50,000.00 |
| **ARCHITECTURAL & ENGINEERING** | | | |
| Architect - | | 3,300,000.00 | 3,300,000.00 |
| Structural Engineer | | 0.00 | 0.00 |
| Mechanical Engineer | | 0.00 | 0.00 |
| Eelectrical Eenginear | | 0.00 | 0.00 |
| DaBo Fire Sprinkler | | 0.00 | 0.00 |
| Specifications | | 0.00 | 0.00 |
| Civil Eengineer - | | 0.00 | 0.00 |
| Soils testing - | | 700,000.00 | 700,000.00 |
| Testing and Misc Land Costs | | 3,000,000.00 | 3,000,000.00 |
| Site Prep | | 13,000.00 | 13,000.00 |
| Utilities | | | |
| | Subtotal | 7,013,000.00 | 7,013,000.00 |
| **IMPACT & CONNECTION FEES** | | | |
| Impact Fees | | 237,000.00 | 237,000.00 |
| Permiting Fees | | 676,000.00 | 676,000.00 |
| | Subtotal | 913,000.00 | 913,000.00 |
| **MARKETING** | | | |
| Brochures design | | | |
| Brochures printing - Beechmont Press | | 4,000,000.00 | 4,000,000.00 |
| Trump Licensing Upfront Fees | | 1,800,000.00 | 1,800,000.00 |
| Advertising | | | |
| Model, Sales Trailer | | 780,000.00 | 780,000.00 |
| Unit Buyout | | 6,580,000.00 | 6,580,000.00 |
| | Subtotal | | |
| **CONDOMINIUM DOCUMENTS** | | | |
| Survey/hud | | 100,000.00 | 100,000.00 |
| | Subtotal | 100,000.00 | 100,000.00 |
| **TAXES, INSURANCE** | | | |
| Insurance | | 2,500,000.00 | 2,500,000.00 |
| Real Estate taxes | | 500,000.00 | 500,000.00 |
| Other | | | |
| | Subtotal | 3,000,000.00 | 3,000,000.00 |
| **PROJECT OVERHEAD** | | | |
| | | 0.00 | 0.00 |
| Management Costs Oversee Project | | 600,000.00 | 600,000.00 |
| SimDag Development Overhead | | 1,200,000.00 | 1,200,000.00 |
| Misc Overhead | | 300,000.00 | 300,000.00 |
| | Subtotal | 2,100,000.00 | 2,100,000.00 |
| **LENDER FEES** | | | |
| Points on Loan | | 1,700,000.00 | 1,700,000.00 |
| Interest On Loan | | 17,928,000.00 | 17,928,000.00 |
| Broker Fee | | 600,000.00 | 600,000.00 |
| | Subtotal | 20,228,000.00 | 20,228,000.00 |
| **CONTINGENCY** | | 778,000.00 | 778,000.00 |
| | Subtotal | 778,000.00 | 778,000.00 |
| | TOTAL SOFT COSTS | 58,582,000.00 | 58,582,000.00 |
| **CONSTRUCTION COSTS** | | | |
| Constuction Costs - Total Direct Work | | 145,853,676.00 | 145,853,676.00 |
| GC - Fee 4% | | 6,300,000.00 | 6,300,000.00 |
| General Conditions | | 9,800,000.00 | 9,800,000.00 |
| Owners Contingency | | 6,480,000.00 | 6,480,000.00 |
| | TOTAL HARD COSTS | 168,433,676.00 | 168,433,676.00 |
| | TOTAL HARD & SOFT COSTS | 227,015,676.00 | 227,015,676.00 |

# Exhibit B

3/29/2006

## Trump Towers Public Grid

| Unit | | $/sq ft | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 4501 | $581 | | | | | | | | | |
| 4301 | $628 | | | | | | | | | |
| 3901 | $509 | | | | | | | | | |
| 4201 | $484 | | | | | | | | | |

| 5101 | $ 1,011 | 6,160,000 |
|---|---|---|

| Unit | $/sq ft | Type 3 | Unit | Type3 |
|---|---|---|---|---|
| 4302 | $556 | | | 2,450 |
| 4202 | $532 | | | 2,380 |
| 4102 | $475 | | | 2,100 |

| $/sq. | Unit | Type 1 | Unit | $/sq. ft | Type 2 | Unit | $/sq ft | Type 3 | Unit | Type3 |
|---|---|---|---|---|---|---|---|---|---|---|
| $508 | 4001 | 1,284,806 | 4002 | $550 | 1,095,000 | 4003 | $542 | 1,238,052 | 4004 | 1,200,000 |
| $459 | 3901 | 1,160,692 | 3902 | $640 | 1,275,000 | 3903 | $543 | 1,238,548 | 3904 | 1,238,548 |
| $712 | 3801 | 1,800,000 | 3802 | $628 | 1,250,000 | 3803 | $423 | 965,130 | 3804 | 1,250,000 |
| $692 | 3701 | 1,750,000 | 3702 | $623 | 1,240,000 | 3703 | $591 | 1,350,000 | 3704 | 1,350,000 |
| $672 | 3601 | 1,700,000 | 3602 | $466 | 928,500 | 3603 | $410 | 937,000 | 3604 | 1,085,000 |
| $663 | 3501 | 1,675,000 | 3502 | $423 | 842,867 | 3503 | $534 | 1,220,000 | 3504 | 1,275,000 |
| | 3401 | | 3402 | $432 | 860,389 | 3403 | $440 | 1,004,728 | 3404 | 909,728 |
| $643 | 3301 | 1,625,000 | 3302 | $603 | 1,200,000 | 3303 | $496 | 1,133,480 | 3304 | 1,250,000 |
| $633 | 3201 | 1,600,000 | 3202 | $600 | 1,195,000 | 3203 | $452 | 1,033,000 | 3204 | 1,250,000 |
| $504 | 3101 | 1,275,000 | 3102 | $399 | 794,474 | 3103 | $548 | 1,250,000 | 3104 | 1,291,000 |
| | | | 3002 | $339 | 675,832 | 3003 | $459 | 1,047,506 | 3004 | 1,047,506 |
| | | | 2902 | $502 | 999,000 | 2903 | $468 | 1,068,414 | 2904 | 1,200,000 |
| $593 | 2801 | 1,500,000 | 2802 | $425 | 846,148 | 2803 | $448 | 1,022,530 | 2804 | 832,253 |
| $583 | 2701 | 1,475,000 | 2702 | $590 | 1,175,000 | 2703 | $482 | 1,100,000 | 2704 | 1,160,000 |
| $574 | 2601 | 1,450,000 | 2602 | $415 | 827,032 | 2603 | $626 | 1,200,000 | 2604 | 1,150,000 |
| $564 | 2501 | 1,425,000 | 2502 | $578 | 1,150,000 | 2503 | $460 | 1,050,000 | 2504 | 1,120,000 |
| $554 | 2401 | 1,400,000 | 2402 | $406 | 808,482 | 2403 | $403 | 920,000 | 2404 | 974,739 |
| $544 | 2301 | 1,375,000 | 2302 | $502 | 1,000,000 | 2303 | $442 | 1,008,446 | 2304 | 1,030,000 |
| $534 | 2201 | 1,350,000 | 2202 | $397 | 790,468 | 2203 | $626 | 1,200,000 | 2204 | 951,883 |
| $494 | 2101 | 1,250,000 | 2102 | $413 | 822,384 | 2103 | $415 | 946,446 | 2104 | 1,100,000 |

# Exhibit B

| | 2001 | | 2002 | | 2003 | | 2004 | |
|---|---|---|---|---|---|---|---|---|
| $378 | 956,016 | $402 | 2002 | 1903 | 800,000 | 2003 | 895,447 | $460 |
| $410 | 1,036,308 | $452 | 1902 | 1803 | 889,000 | 1903 | 1,910,044.00 | $427 |
| $367 | 928,171 | $380 | 1802 | 1703 | 755,999 | 1803 | 2,230,000.00 | $499 |
| $485 | 1,225,000 | $420 | 1702 | 1603 | 835,980 | 1703 | 2,180,000.00 | $487 |
| $465 | 1,175,000 | $359 | 1602 | | 714,536 | 1603 | 2,100,000.00 | $469 |
| $465 | 1,175,000 | $410 | 1502 | 1403 | 817,185 | | 2,030,000.00 | $454 |
| $32B | 829,075 | | | 1203 | | | 1,900,000.00 | $425 |
| $336 | 849,408 | | 1201 | 1103 | 633,138 | | 1,800,000.00 | $402 |
| $435 | 1,100,000 | $318 | 1102 | | | | | |
| | 39,119,376 | | 26,931,384 | | | 22,983,310 | 23,561,104 | |

| | |
|---|---|
| Lower Penthouses | $ 15,872,044 |
| Boutique Penthouses | $37,587,000 |
| Top Penthouses | 17,507,000 |
| Grand Penthouses | $16,154,000 |

| | UNITS | TOTAL SF |
|---|---|---|
| | 58 | 146624 |
| | 58 | 115478 |
| | 42 | 95886 |
| | 8 | 35784 |
| | 5 | 22085 |
| | 10 | 45420 |
| | 3 | 10302 |
| | 6 | 16446 |
| | 4 | 11972 |
| | 1 | 6085 |
| | 195 | 506082 |

| | EA SF | Starting Sq Ft Price |
|---|---|---|
| Type 1 | 2528 | 265 |
| Type 2 | 1991 | 230 |
| Type 3 | 2283 | 310 |
| Lower Penthouses | 4473 | 350 |
| Boutique Penthouse D | 4417 | |
| Boutique Penthouse C | 4642 | 450 |
| Boutique Penthouse B | 3434 | 500 |
| Boutique Penthouse A | 2741 | 650 |
| Upper Penthouse | 2993 | 650 |
| Grand Penthouse | 6085 | 750 |
| Totals | 506082 | |