UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEVE AARON, et al.,

    Plaintiffs,

v.                                        CASE NO.: 8:09-cv-2493-T-23AEP

THE TRUMP ORGANIZATION, INC.,
and DONALD TRUMP,

    Defendants.
_____/

**ORDER**

The plaintiffs move (Docs. 78, 130) for partial summary judgment on count one of the second amended complaint (Doc. 19), which alleges a violation of the Interstate Land Sales Full Disclosure Act (the "ILSFDA"), 15 U.S.C. §§ 1701-20. Specifically, the plaintiffs request a determination (1) that the defendants are "developers," "agents," or "aiders and abettors"; (2) that the "existence and terms" of a "secret license agreement" are "material facts"; and (3) that the defendants first disclosed the license agreement on May 25, 2007. The plaintiffs argue that, after summary judgment, "[t]he only real issue left for trial on this claim should be damages." The defendants respond (Doc. 116) in opposition and argue that the plaintiffs must prove additional elements, including reasonable reliance, to establish the defendants' liability under the ILSFDA.

Background

In this action, each plaintiff seeks to recover a deposit securing the purchase of a unit in a proposed development known as the Trump Tower Tampa.[1] Among other pursuits, the defendant Donald Trump (through The Trump Organization) develops real estate throughout the world.[2] In early 2005, Trump and the Tampa, Florida-based SimDag-RoBEL, LLC, ("SimDag") announced a plan to build an "ultra-luxury" residential condominium in downtown Tampa. SimDag was comprised of local developers Frank Dagostino, Howard Howell, Robert Lyons, Patrick Sheppard, and Jody Simon.[3] In advance of the announcement, Trump executed a confidential license agreement that memorialized Trump's collaboration with SimDag.[4] The agreement allowed SimDag to use Trump's name to identify and to market the project in exchange for SimDag's paying a licensing fee and in exchange for SimDag's developing the property in accord with the "Trump Standards" (as defined by the agreement).[5] Trump invested no capital in the project. However, to ensure that the project satisfied the "Trump Standards," the agreement vested Trump with authority to review and approve (1) interior and exterior components of the building; (2) engineering and design of the building; (3) floor plans, specifications, fixtures and appliances; and (4) promotional material containing the

---

[1] (Docs. 78, 116)

[2] (Docs. 78, 116)

[3] (Docs. 78, 116)

[4] (Doc. 79-1)

[5] (Docs. 79-1, 78, 116)

Trump mark.[6] Additionally, the agreement permitted Trump to terminate his involvement in the project and to prohibit further use of his name in certain delineated circumstances.[7] In May 2007, Trump sued SimDag for breach of the license agreement and publicly disclosed the license agreement.[8]

In this action, the plaintiffs argue that, even though Trump was neither a developer nor a partner nor an investor in the project but merely a licensor, Trump presented himself as a partner in, and a developer of, the project.[9] In particular, the plaintiffs identify (1) a press release stating that the Trump Tower Tampa "will be developed in a partnership with local Tampa Bay-area developers, SimDag-Robel, LLC" and (2) the project's logo, which identifies the project as "Trump Tower Tampa—A Donald J. Trump Signature Property—A Development of Donald J. Trump and SimDag-Robel, LLC."[10] The plaintiffs identify a series of publications[11] in which Trump "actively marketed" and presented himself as a "partner" in, and a "developer" of, the Trump Tower Tampa. The plaintiffs describe instances in which Trump and the Trump Organization acted in a manner "consistent with their advertised role as a developer of the project," which instances include (1) the defendants' reviewing and approving promotional material, (2) the defendants' approving plans and specifications for the

---

[6] (Docs. 78, 79-1, 116)

[7] (Doc. 79-1, ¶ 6)

[8] (Doc. 78; Case No. 8:07-cv-910-T-27TBM, Doc. 2)

[9] (Doc. 78)

[10] (Doc. 78)

[11] (Docs. 79-2, 81-1, 81-2, 87-1)

development, and (3) the defendants' controlling the preliminary and final plans. Additionally, the plaintiffs argue that the confidential license agreement (which the defendants disclosed in May, 2007) materially "affected the value of what the [p]laintiffs thought they were buying" and that "a reasonable purchaser would have considered it important to know that there was a secret [l]icense [a]greement between the [d]efendants and SimDag".[12]

The defendants, however, identify in the marketing material a disclaimer of "any representation or warranty by Donald J. Trump" and an instruction to obtain "correct representations[] [by] reference . . . to the documents required by Section 718.503 Florida Statutes[] to be furnished by a developer to a buyer or lessee."[13] Additionally, the defendants rely on the purchase agreement and accompanying disclosures, which identify SimDag as the developer of the unit. The defendants cite the "property report,"[14] which states that SimDag "has not had any significant operating experience [and] . . . has no had prior experience in the development of condominiums." The defendants quote both the condominium documents, in which SimDag advises "of the risk that material changes could be made to the project," and the property report, in which SimDag provides no assurance "that the condominium will be built as proposed." The defendants assert that, after the May, 2007, disclosure of the license agreement

---

[12] (Doc. 78)

[13] (Docs. 87-1, 88-1, 88-2)

[14] (Doc. 79-3)

between Trump and SimDag, several (if not all) of the plaintiffs signed an addendum "reaffirm[ing]" the purchase agreement with SimDag.[15]

## Discussion

In moving for partial summary judgment, the plaintiffs argue (1) that the defendants are either "developers," "agents," or "aiders and abettors" under the ILSFDA; (2) that the license agreement is a "material fact" under the ILSFDA; (3) that the defendants failed to disclose the license agreement until May 25, 2007; (4) that the plaintiffs need not prove the elements of securities fraud to establish a claim under the ILSFDA; and (5) that, even if the ILSFDA requires the plaintiffs' establishing the elements of securities fraud, the plaintiffs' claim is nonetheless susceptible to partial summary judgment. The defendants respond (1) that, to establish liability under the ILSFDA, the plaintiffs must establish the elements of securities fraud, including reasonable reliance and scienter; (2) that the defendants neither received nor controlled the money deposited by the plaintiffs; (3) that Rule 56 prohibits summary judgment on "discrete elements of liability [that] would dispose of less than the entire claim"; (4) that the defendants qualify neither as a "developer" nor as an "agent" under the ILSFDA; (5) that "aiding and abetting" liability is unavailable under the ILSFDA; (6) that the defendants' obligation to disclose a material fact arises only if the disclosure is "necessary to make statements actually made by the defendant not misleading"; (7) that each allegedly misleading statement was true and accurate at the time; and (8) that the

---

[15] (Doc. 116)

term "partner" is susceptible to varied interpretations and is not amenable to determination as a matter of law in this instance.

### 1. Elements of an ILSFDA Claim

"[T]he ILSFDA is an anti[-]fraud statute utilizing disclosure as its primary tool, much like the securities laws." Winter v. Hollingsworth Prop. Inc., 777 F.2d 1444, 1446-47 (11th Cir. 1985) (Tjoflat, J.) (explaining that the purpose of the ILSFDA is "to curb abuses accompanying interstate land sales" and finding that the ILSFDA applies to the sale of a condominium). In this action, the plaintiffs sue under Section 1709(a) and allege[16] that the defendants violated Section 1703(a)(2), the "ILSFDA's general anti-fraud provisions". Taplett v. TRG Oasis (Tower Two), Ltd, 755 F. Supp. 2d 1197, 1999 (M.D. Fla. 2009) (Mills, J.). Section 1703(a)(2) contains the following prohibition:

> It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—
>
> . . .
>
> (2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title—
>
> (A) to employ any device, scheme, or artifice to defraud;
>
> (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;
>
> (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser;
>
> . . . .

---

[16] (Doc. 19)

- 6 -

A fact is "material" if "a reasonable [purchaser] might have considered the omitted fact or erroneous statement as important in making a decision." Paquin v. Four Seasons of Tennessee, Inc., 519 F.2d 1105, 1109 (5th Cir. 1975).[17] Accordingly, to establish the "materiality" of an omitted fact under Section 1703(a)(2), a plaintiff must demonstrate that a reasonable purchaser would have relied on the statement in deciding whether to purchase the property. See Santidrian v. Landmark Custom Ranches, Inc., 405 F. App'x 381, 384 (11th Cir. 2010) (per curiam); Taplett, 755 F. Supp. 2d at 1200-03; Weaver v. Opera Tower, LLC, 2008 WL 4145520, *2 (S.D. Fla. 2008) (Seitz, J.); Ivar v. Elk River Partners, LLC, 705 F. Supp. 2d 1220, 1236-38 (D. Colo. 2010) (Arguello, J.); H.R. REP. 96-154, 35 (1979), reprinted in 1979 U.S.C.C.A.N. 2317, 2351, 1979 WL 10229, *31 (explaining that, although the 1979 amendment to the ILSFDA eliminates "actual reliance" as an element of proof, "it is clear that in proving that an untrue or omitted fact [i]s material, it must be established that the fact was important enough that a reasonable person would have relied upon it in making a decision to purchase or lease that particular piece of land.").

### 2. *A Developer or an Agent Under the ILSFDA*

Section 1701(5) defines a "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." Section 1701(6) defines an "agent" as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any

---

[17] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), renders binding each decision of the former Fifth Circuit Court of Appeals issued on or before September 30, 1981.

lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services."

No controlling precedent elaborates the statutory definition of a "developer" or an "agent" under the ILSFDA. However, Sewell v. D'Alessandro & Woodyard, Inc., 655 F. Supp. 2d 1228, 1254 (M.D. Fla. 2009) (Steele, J.), amended in part on other grounds by 709 F. Supp. 2d 1251 (M.D. Fla. 2010), concludes that the plaintiffs sufficiently allege that the defendant (a real estate agent) is an "agent" as defined by the ILSFDA. The complaint in Sewell describes the real estate agent's "personally participat[ing] in the offer to sell," "faxing the [p]rospectus to the plaintiffs," and proffering several "oral representations" about the quality of both property and the investment. Sewell rejects the defendant's argument that, because she neither owned the lots nor possessed authority to convey the lots, she was not an "agent" under the ILSFDA.[18]

At the very least, a defendant qualifies as either a "developer" or an "agent" under Section 1701 if the defendant indirectly advertises for sale or personally participates in the offer to sell a "lot," which the Eleventh Circuit Court of Appeals interprets as

---

[18] See generally Santridian v. Landmark Custom Ranches, Inc., 2008 WL 4571820, *3 (M.D. Fla. 2008) (Cohn, J.) (finding that "[a]n individual does not become personally liable under the ILS[FD]A without some personal involvement in the sale or offer to sell" and that "there is no language in the ILS[FD]A that requires an agent to have authority to sell a property, since the definition of 'agent,' includes those who participate in the 'offering to sell' any lot in a subdivision."); Kemp v. Peterson, 940 F.2d 110, 114 (4th Cir. 1991) (finding that a controlling shareholder, officer, or director of a corporation is susceptible to liability); Gibbes v. Rose Hill Plantation Devel. Co., 794 F. Supp. 1327, 1333 n.9 (D.S.C. 1992) (Norton, J.) (explaining that "the determining factor is whether each defendant participated in sales or could be considered as a controlling person in an organization that participated in sales."); compare Hammar v. Cost Control Mktg. & Sales Mgmt. of Va., Inc., 757 F. Supp. 698, 702 (W.D. Va. 1990) (Michael, J.) (finding that a lender "acting in the ordinary course of dealing" is not a "developer" under the ILSFDA). Olsen v. Lake Country, Inc., 955 F.2d 203, 206 (4th Cir. 1991) (per curiam), finds that the defendant qualifies as a "developer" under the ILSFDA, even though the defendant "only bought and re[-] sold lots in a completed subdivision" (1) because the land "was not, in fact, fully developed" and (2) because the defendant "was not merely an incidental player in the . . . sales scheme . . . [but] was actively involved in the planning and promotion of the development".

- 8 -

"refer[ring] generally to interests in realty". See Winter, 777 F.2d at 1446-49 (examining the statute, regulations by the Department of Housing and Urban Development ("HUD"), statements by the HUD Secretary, legislative history, and applicable precedent).

In this action, the plaintiffs argue that the defendants qualify as either a "developer" or an "agent" under the ILSFDA (1) because the defendants "actively marketed units in the Trump Tower Tampa"; (2) because the defendants "held themselves out as partners with SimDag in developing the Trump Tower Tampa"; and (3) because the defendants "acted in a manner consistent with their advertised role as a developer of the project". In response, the defendants argue (1) that "[a]ll of the legal documents received by the [p]laintiffs identify SimDag as the [p]roject's sole developer"; (2) that each plaintiff knew that SimDag was the developer when the plaintiff signed the purchase agreement; (3) that the defendants bore no "direct development responsibilit[y]" for the project; and (4) that the defendants lacked both authority to establish the price of a unit and responsibility for compliance with the ILSFDA.

Under the language of the ILSFDA, the defendants undoubtedly qualify as either a "developer" or an "agent". The defendants not only acted on behalf of SimDag in promoting the sale of the units, but the defendants distributed marketing material that portrayed the Trump Tower Tampa as an "exclusive," Trump development, i.e., one of "the finest properties from the biggest name in real estate".[19] Alongside the Mar-A-Lago Club, Villa Trump, and Trump National Golf Club, the defendants advertised the Trump Tower Tampa. In the defendants' marketing material and other public statements, the

---

[19] (Doc. 81-1)

- 9 -

defendants espoused the quality and the prestige of the Tampa development, "A
Donald J. Trump Signature Property".[20] In addition to intimating ownership of the Trump
Tower Tampa, the defendants became personally and actively involved in planning and
promotion. The defendants possessed final authority over several key aspects of the
design and development of the building as well as the promotional material drafted by
SimDag and adorned by the Trump mark. Therefore, at a minimum, the defendants
indirectly advertised for sale or personally participated in the sale of the units in the
Trump Tower Tampa. Similar to Sewell and Santridian, the defendants' lacking both
authority to establish the price of a unit and direct development responsibility bears no
relevance to the defendants' status as either a developer or an agent under the
ILSFDA.

### *3. Aiding and Abetting Liability under the ILSFDA*

"[A]iding and abetting liability extends beyond persons who engage, even
indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do
not engage in the proscribed activities at all, but who give a degree of aid to those who
do." Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S.
164, 176-78 (1994) (explaining that "Congress knew how to impose aiding and abetting
liability when it chose to do so" and that Congress "would have used the words 'aid' and
'abet' in the statutory text" of the securities laws if Congress intended to impose aiding
and abetting liability). Section 1703(a)(2) contains no prohibition on "aiding and

---

[20] (Doc. 88-2)

abetting" a violation of the ILSFDA. Accordingly, the defendants are not amenable to liability as "aiders and abetters" of a violation of Section 1703(a)(2).

*4. Materiality of the License Agreement*

As discussed previously, an omitted or stated fact is "material" under Section 1703(a)(2) if a reasonable purchaser would consider the fact important and would rely on the fact in deciding whether to purchase the property. "[T]he materiality inquiry is objective and examines the significance of the omitted fact to a hypothetical reasonable investor, not to the specific plaintiff." Burns v. Duplin Land Dev., Inc., 621 F. Supp. 2d 292, 308 (E.D.N.C. 2009) (Dever, J.) (explaining that "the reasonable investor standard requires 'a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor].'") (citations omitted). Furthermore, "the fact that omitted information is publicly available does not defeat materiality as to a seller's omission . . . '[I]nvestors are not generally required to look beyond a given document to discover what is true and what is not.'" 621 F. Supp. 2d at 308.

In this instance, the plaintiffs assert (1) that the plaintiffs expected to live in a "Trump Signature Property"; (2) that the license agreement "meant that buyers were not buying a Trump—they were buying a SimDag that might carry the Trump name"; (3) that the defendants' marketing material led the plaintiffs to believe that Trump was a "fully invested 'partner'" in the development; (4) that, in fact, Trump "had no capital investment in the project, little or no financial risk, and little incentive to remain involved if . . . SimDag encountered problems; (5) that the license agreement is material because

the agreement "affected the value of what the [p]laintiffs thought they were buying"; (6) that a Trump development achieves and maintains substantially greater value than other developments; and (7) that, if a purchaser had known "the true relationship between the [d]efendants and SimDag, the[] [purchaser] would have considered it important in deciding whether to buy a unit."  In response, the defendants argue (1) that the statements describing the defendants' "partnership" with SimDag and describing the Trump Tower Tampa as a "Donald J. Trump Signature Property" were "true and accurate" at the time; (2) that the defendants "were partnering with SimDag under the [l]icense [a]greement to ensure that the [p]laintiffs received units which conformed to the standards associated with 'Trump' properties"; (3) that the defendants "made a substantial investment of sweat equity in the [p]roject"; (4) that the plaintiffs' assumptions about Trump's "capital investment" and financial backing "were expressly contradicted by the [p]urchase [a]greements and other [c]ondominium [d]ocuments"; (5) that the plaintiffs "signed agreements acknowledging that they were not relying on these statements"; and (6) that, "[b]ecause materiality is measured through an objective 'reasonable person' standard, the [p]laintiffs' imposition of their own particularized meaning to the word 'partner' . . . cannot . . . set the standard by which the [defendants'] statement is to be analyzed."

In this instance, the plaintiffs claim that the defendants omitted a material fact (the license agreement) necessary to render "not misleading" the statements about the defendants' "partnership" with SimDag in the Trump Tower Tampa development. However, the plaintiffs' argument and evidence on this point concentrates

predominantly on the plaintiffs' subjective belief and expectation (based on the defendants' statements) rather than an objective evaluation from the perspective of a reasonable purchaser. As the defendants argue, a reasonable purchaser's interpretation of the stated "partnership" between the defendants and SimDag is not susceptible to determination based solely upon the plaintiffs' interpretation of the word "partner". Whether under the circumstances (including the property report, purchase agreement, condominium disclosures, and other disclaimers) a "reasonable likelihood" exists that the omitted or untrue fact "would have assumed actual significance in the deliberations of the reasonable [investor]'" remains a genuine issue of material fact. Burns, 621 F. Supp. 2d at 308. Accordingly, the ILSFDA claim is not susceptible to summary judgment on this point.

### *5. The Day of Disclosure of the License Agreement*

Additionally, the plaintiffs request a determination as a matter of law that the defendants failed to disclose the license agreement until May 25, 2007, when the defendants sued SimDag for breach. The plaintiffs rely entirely upon the defendants' complaint and SimDag's counterclaim for breach of the confidentiality provision. In response, the defendants argue (1) that the defendants' only contact with a purchaser occurred after the signing of the purchase agreement and through SimDag's principals and agents and (2) that the plaintiffs fail to present affidavits or other evidence showing that the plaintiffs never learned of the license agreement from SimDag's principals and agents (through whom the defendants communicated). Allowing the defendants a favorable construction of the evidence and providing the defendants a reasonable

inference, the evidence appears insufficient to support summary judgment on the day of disclosure of the license agreement.

Conclusion

Under Rule 56(g), a court "may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Accordingly, the motion (Doc. 78) for partial summary judgment is **GRANTED IN PART** and the defendants adjudged "developers" or "agents" as defined by the ILSFDA. The motion (Doc. 78) is otherwise **DENIED**. The defendants' motion (Doc. 132) for leave to file a supplemental exhibit—deposition transcripts demonstrating that the term "partner" is susceptible to varied interpretations—is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on July 15, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE