UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEVE AARON, et al.,

        Plaintiffs,

vs.

                                    Case No. 8:09-cv-2493-SDM-TGW

THE TRUMP ORGANIZATION, INC., a
New York Corporation, and DONALD J.
TRUMP, an individual,

        Defendants.

_____/

## DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56, Defendants The Trump Organization, Inc. ("Trump Org.") and Donald J. Trump ("Trump") (collectively "Defendants"), though their undersigned counsel, hereby move for Final Summary Judgment on all counts of the Plaintiffs' Second Amended Complaint (the "Complaint"), as follows:

## I.  INTRODUCTION

This action is an effort by 45 Plaintiffs[1] to recover half of the deposits they paid to purchase units in a proposed condominium building that was to be constructed in Tampa (the

---

[1] Though there had been 54 initial plaintiffs, on October 19, 2011, the parties filed a stipulation dismissing plaintiffs James S. Moody, III, Ashley Moody, Patricia Moody McNab, individually, and on assignment from James S. Moody, Jr., and Irma C. Moody as trustee of the Irma Moody Revocable Trust (Dkt. 164.) and on October 6, 2011, plaintiffs Dennis Crum, NLR, T, LLC, Alex Petro, Douglas Rhoten and Joseph Shultz filed a notice accepting offers of judgment from Defendants (Dkt. 155) and, on October 12, 2011, judgment was entered in accordance therewith (Dkt. 158).  Said judgments were satisfied on October 12, 2011 (Dkt. 159).

"Project").[2]  Like countless others across the nation, the Project fell victim to the almost total collapse of the nation's real estate and credit markets.  Additionally, beset by skyrocketing construction costs, and issues with soil instability, and despite the best efforts of all involved parties, the Project's owner and developer, SimDag Robel, LLC ("SimDag"), was unable to secure construction financing.  Ultimately, SimDag became insolvent and filed for Chapter 11 bankruptcy protection and the buyers were given back half their deposits as expressly provided in their contracts.

Not satisfied with this result, Plaintiffs have brought the present action.  However, instead of suing SimDag, (i) the party with whom they contracted, (ii) the party to whom they paid their deposits, (iii) the party which spent half their deposits and (iv) the party that is no longer in business, Plaintiffs have unjustifiably turned their attention to Defendants, alleging four (4) fraud based claims: violation of 15 U.S.C. § 1703(a)(2)(B) of the Interstate Land Sales Full Disclosure Act ("ILSA") (Count I), Negligent Misrepresentation (Count II), Fraudulent Misrepresentation (Count III) and Information Negligently Supplied (Count IV).  In support of there claims, Plaintiffs point to select portions of a series of press releases, marketing brochures and news articles to contend that "even though Trump was neither a developer nor a partner nor an investor in the project but merely a licensor, Trump presented himself as a partner in, and a developer of, the project." (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 3.)  More specifically, Plaintiffs identify the following four (4) categories of purported misstatements (together, the "Alleged Misrepresentations"):

---

[2] All plaintiffs previously recovered half of their deposits from the Project's developer, SimDag Robel, LLC.

1.  "a press release stating that the Trump Tower Tampa 'will be developed in a partnership with local Tampa Bay-area developers, SimDag-Robel, LLC'" (the "Press Release");

2.  "the project's logo, which identifies the project as 'Trump Tower Tampa – A Donald J. Trump Signature Property-A Development of Donald J. Trump and SimDag-Robel, LLC'" (the "Logo"), which appears on the cover of a silver marketing booklet (the "Silver Book");

3.  "a series of publications in which Trump 'actively marketed' and presented himself as a 'partner' in, and a 'developer' of, the Trump Tower Tampa" (the "Publications"); and

4.  "instances in which Trump and the Trump Organization acted in a manner 'consistent with their advertised role as a developer of the project,' which instances include (1) the defendants' reviewing and approving promotional material, (2) the defendants' approving plans and specifications for the development, and (3) the defendants' controlling the preliminary and final plans" (the "License Agreement Obligations").[3]

(Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 3-4.)  Additionally, Plaintiffs identify a single purported misrepresentation by omission: that by failing to disclose the existence of an October 27, 2004 license agreement (the "License Agreement") between Trump and SimDag, Trump led Plaintiffs to believe that he was partnering in and developing the Project (the "Alleged Omission").

However, Plaintiffs claims are not sustainable as a matter of law.  As an initial matter, not only did the actual words used in the Marketing Materials – "partner", "partnership", "developing" and "development" -- all accurately describe Trump's role in the Project,[4] but it is

---

[3] The Press Release, the Silver Book and the Publications are collectively referred to herein as the "Marketing Materials".

[4] Plaintiffs do not identify a single instance in which Defendants referred to themselves as the "developer".

undisputed that the combination of the Purchase Agreement [**Exhibit 1**], Property Report [**Exhibit 2**], Prospectus [**Exhibit 3**] and Condominium Declaration [**Exhibit 4**] (together, the "Condominium Documents") disclosed, in numerous locations, that SimDag was the "Seller" and "Developer" of the Project, that SimDag was responsible for all aspects associated with the construction of the Building and that SimDag had no prior experience developing condominiums.  In addition, the Condominium Documents disclosed that it was possible that the Project would not be completed and that buyers could lose half of their deposits because only half was being escrowed.  In the end, that is exactly what occurred.  Thus, no material fact was misrepresented.

As if that were not enough, the Condominium Documents repeatedly warned buyers that the only representations being made were those within the Condominium Documents, that they could not rely on oral or written statements or representations made outside the Condominium Documents, such as those in the Marketing Materials, and that they were agreeing that the primary inducement for entering into the Purchase Agreement was the "Unit itself".  Moreover, the Silver Book, the primary piece of marketing material relied on by Plaintiffs to make out their claims, apart from identifying (by name) each of the principals of SimDag (of which Trump is not listed as one of them), expressly stated that "The presentation of these materials does not constitute any representation or warranty by Donald J. Trump." Notwithstanding the foregoing, numerous purchasers testified that they never even bothered to read the Condominium Documents or never saw the Marketing Materials prior to signing their Purchase Agreements. This alone is fatal to their claims.

Though Defendants believe that the wealth of disclosures and warnings made to Plaintiffs was more than sufficient, even if they were not, the terms "partner", "partnership", "developing"

and "development" were not factual misrepresentations, but merely used to describe the cooperative relationship between two parties who were working together to develop a condominium. Indeed, these terms are susceptible to so many different interpretations and meanings that they could not possibly form the basis for any type of fraud claim. This is demonstrated by the fact that while Plaintiffs contend that Trump misrepresented himself as "developing" the Project, they also vigorously argue that Trump should be considered a "developer" under the definition promulgated by ILSA. Plaintiffs cannot have it both ways. Furthermore, in light of the total mix of information that was available to buyers, whether in the Condominium Documents or the Marketing Materials, Plaintiffs cannot demonstrate a substantial likelihood that the disclosure of the License Agreement would have assumed actual significance in the minds of any reasonable buyer – not to mention one purchasing a high-end luxury condominium. Thus, final summary judgment should be granted as to Plaintiffs' ILSA claim.

As for Plaintiffs' common law claims, apart from the fact that there were no material misrepresentations or omission, Plaintiffs cannot, as a matter of law, demonstrate justifiable reliance. Even if they could, there is no evidence to suggest that Defendants were in the business of supplying information - such that they would have had a duty of care to the Plaintiffs. Nor can they establish that either the Alleged Misrepresentations or Alleged Omission was the proximate cause of their loss. Instead, it is undisputed that the reason Plaintiffs lost half their deposits was because the Project encountered soil issues and could not get construction financing. Thus, final summary judgment should be granted as to Plaintiffs' claims for negligent misrepresentation, fraudulent misrepresentation and information negligently supplied.

## II.  SUMMARY OF THE FACTS

### A.       The Inception of the Project

Frank Dagostino, Howard Howell, Robert Lyons, Patrick Sheppard and Jody Simon are all Tampa area businessmen who are the principals of SimDag.  [**Exhibits 5** and **6**] Sometime after forming, SimDag acquired a 1.5 acre piece of riverfront property in downtown Tampa (the "Property").  [**Exhibit 5**]  After considering several possibilities, SimDag ultimately decided to develop an "ultra-luxury" residential condominium building on the Property (the "Building"). Id.  To that end, SimDag contacted Trump to see if he would participate and lend his name to the Project. Id.

### B.       The License Agreement

On October 27, 2004, Trump and SimDag executed the License Agreement, memorializing their relationship.  [**Exhibit 7**]  Pursuant to the License Agreement, in exchange for certain fixed and contingent fees, Trump agreed to license his name to identify, market and brand the Project, while SimDag agreed to serve as the Project's developer and to build the Project in accordance with the standards of quality associated with the "Trump" name (the "Trump Standards").  [**Exhibit 7**]

To ensure that the Building would conform to the Trump Standards, the License Agreement gave Trump broad authority to review and approve "all plans and specifications for the Building and interior and exterior components thereof . . . ." including (a) "the engineering and design of the Building and all service systems of the Building"; (b) "the exterior of the Building, including, but not limited to, the façade, landscaping, access methods, and illumination"; (c) "the unit layouts and room counts;" and (d) "all fixtures and appliances." [**Exhibit 7**]  In addition, the License Agreement gave Trump the right to remove his name from

the Project under certain narrowly defined circumstances, such as SimDag filing for bankruptcy, the Building not being constructed in conformance with the Trump Standards, the Building being taken in condemnation or eminent domain, or SimDag's failure to commence construction and complete within a certain period of time.  [**Exhibit 7**]

### C.    The Purchase Agreements

On January 10, 2005, the Project was announced to the public via the Press Release and a series of Marketing Materials were made available to prospective purchasers.  [**Exhibit 8**]  At different times thereafter, the buyers, including all of the Plaintiffs, signed identical Purchase Agreements and paid SimDag deposits totaling 20% of their unit's purchase price.  (Plaintiffs' Second Amended Complaint Dkt. 19 at ¶ 18.)  SimDag placed half of the deposit amounts in escrow, and used the other half to pay construction costs.  [**Exhibit 1** at ¶¶ 1 and 9]  Among other disclosures, the Purchase Agreements expressly stated that SimDag was both the "seller" and "developer" of the Project and the party ultimately responsible for constructing and developing the Project. [**Exhibit 1**]  In addition, the Purchase Agreements warned buyers that they could not rely on any statements, promises or representations, express or implied, outside the Purchase Agreement and other Condominium Documents.  [**Exhibit 1** at ¶¶ 8, 25, and 32]

As time progressed, however, the Project began encountering problems, was unable to obtain construction financing and SimDag stopped paying the monthly fees owed to Trump under the License Agreement.  (Plaintiffs' Second Amended Complaint Dkt. 19 at ¶¶ 19 and 21.) In response, on May 29, 2007, Trump terminated the Agreement and sued SimDag and its principals for breaching the License Agreement ("the SimDag Litigation").  *Trump v. SimDag/Robel, LLC*, No. 8:07-cv-00910 (M.D. Fla. May 25, 2007).

### D.     The Plaintiffs Ratify Their Purchase Agreements

Several months <u>after</u> the commencement of the SimDag Litigation, the buyers/plaintiffs executed addenda to their Purchase Agreements stating that, upon SimDag securing construction financing, "all terms, conditions, and revisions of the [Purchase] Agreement shall remain in full force and effect as modified by the Addendum . . . ."  Most, if not all, of the Plaintiffs signed such addenda.  Attached as composite **Exhibit 9** are copies of the Addenda executed by sixteen (16) Plaintiffs.[5]

### E.     The Project Ultimately Fails, and Plaintiffs Sue Trump

Eventually, in May 2008, SimDag's initial lender, Mercantile Bank, began foreclosure proceedings on the Property.  *Colonial Bank N.A. v. SimDag/Robel, LLC*, No. 08-CA-010802 (Fla. Cir. Ct. May 15, 2008).   On June 17, 2008, SimDag filed for Chapter 11 bankruptcy protection, which stayed the foreclosure action.  *In re SimDag/Robel, LLC*, No. 8:08-bk-08804-KRM (M.D. Fla. June 17, 2008).   On July 28, 2008, the Bankruptcy Court entered its Order allowing SimDag to return deposits to unit purchasers, including the Plaintiffs.  *Id.* at Dkt. 62.  Pursuant to the Order, SimDag returned all of the deposits it held in escrow, which amounted to half of Plaintiffs' deposits.  The bankruptcy case was dismissed after SimDag failed to find the financing necessary to reorganize.  *Id.* at Dkt. 177.  On November 12, 2009, the Plaintiffs filed this action to attempt to recover the other half of their deposits, asserting causes of action against the Defendants under ILSA and for fraudulent misrepresentation, negligent misrepresentation, and information negligently supplied.

---

[5] Plaintiffs, Steve Aaron, Ilene Aaron, Ben Benvenuti, Robert Gesemyer, Alan Bridges, Art Caruso, Jill Caruso, Michael Dinkel, Catherine Gouze, H2O Front Investments, Naik Family Limited Partnership, John Robbins, Rosanna Schanne, Davey Sehwani, Hoshedar Tamboli and William Zwick.

### III. <u>ARGUMENT</u>

#### A. <u>Summary Judgment Standard</u>

The following summary judgment standard of this Court is set forth in *Sleit v. Ricoh Corp.*, 2008 WL 4826113 (M.D. Fla. 2008) (J. Merryday) (granting motion for summary judgment):

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court may look to "the pleadings, the discovery and disclosure materials on file, and any affidavits" in determining whether summary judgment is appropriate. Fed.R.Civ.P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir.1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *Perkins v. Sch. Bd. of Pinellas County,* 902 F.Supp. 1503, 1505 (M.D.Fla.1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e)(2).

When deciding a motion for summary judgment, "[i]t is not part of the court's function ... to decide issues of material fact, but rather determine whether such issues exist to be tried ..." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston,* 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston,* 9 F.3d at 921; *see also Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 959 (11th Cir.1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997).

B.  **Final Summary Judgment as to Count I (ILSA)**

1.  **The Alleged Misrepresentations and Omission Were Not "Material".**

It is well settled that to demonstrate a claim under § 1703(a)(2)(B) of ILSA, a plaintiff must establish the elements of fraud.  *See Degirmenci v. Sapphire-Fort Lauderdale, LLLP*, 693 F. Supp. 2d 1325, 1342-43, 1355 n.2a (S.D. Fla. 2010)(recognizing that the elements of fraud apply to claims under ILSA which sound in fraud); *Sewell v. D'Alessandro & Woodyard, Inc.*, 655 F. Supp. 2d 1228, 1255-56 (M.D. Fla. 2009)(recognizing that scienter and reliance are elements of a claim under § 1703(a)(2), and rejecting the plaintiffs' contention that under § 1703(a)(2) they "need only establish a material omission or misrepresentation….") *modified on other grounds*, 709 F. Supp. 2d 1251 (M.D. Fla. 2010), *modified on other grounds*, 725 F. Supp. 2d 1344 (M.D. Fla. 2010); *Weaver v. Opera Tower, LLC*, 2008 WL 4145520, at *2 (S.D. Fla. 2008); *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1294-95 (S.D. Fla. 2007).

In addition to establishing the elements of fraud, to make out a claim under ILSA § 1703(a)(2), a plaintiff must also demonstrate the element of "materiality".[6]  (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 7.)  As this Court has explained, "'a fact is 'material'

---

[6] Although this Court has previously suggested that the "1979 amendment to the ILSFDA eliminates 'actual reliance'" (Dkt. 136 at 7), at least one court in the Middle District has previously held that "reliance is a requirement" of ILSA § 1703(a)(2) consistent "with the securities laws it is modeled on".  *Taplett v. TRG Oasis (Tower Two), Ltd., LP*, 744 F.Supp.2d 1197, 1202 (M.D.Fla. 2009) (Judge Mills).

if a reasonable [purchaser] might have considered the omitted fact or erroneous statement as important in making a decision.'"  *Id.* at 7.  Moreover, § 1703(a)(2)(B) provides that the alleged statements must be considered  "in light of the circumstances in which they were made within the context of the overall offer and sale."  *Id.* at 6.  Accordingly, to establish "materiality", Plaintiffs must demonstrate that a "reasonable purchaser", in this case contracting to buy a high-end luxury condominium unit, "would have relied on the statement in deciding whether to purchase the property."  *Id.* at 7.

(a)     **A Reasonable Purchaser Could Not Have Relied Given The Language In the Condominium Documents.**

Here, however, Plaintiffs cannot establish "materiality" because they cannot demonstrate that a reasonable purchaser, contracting to purchase a high-end luxury condominium, could have or would have relied on the Alleged Misstatements or the Alleged Omission given the numerous disclosures contained in the Condominium Documents.   As an initial matter, the Purchase Agreement [**Exhibit 1**] clearly states on the top of the very first page that:

> "**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECLY STATING THE REPRESENTATION OF THE DEVELOPER.    FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT AND THE DOCUMENTS REQUIRED BY DECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO BUYER OR LESSEE.**"

[**Exhibit 1**]

Furthermore, Paragraph 8 of the Purchase Agreement, entitled "**WARRANTY AND DISCLAIMER**", provides, as follows:

> "**NO     WARRANTIES,     EXPRESS     OR     IMPLIED, REPRESENTATIONS, UNDERSTANDINGS, GUARANTIES OR PROMISES HAVE BEEN MADE TO OR RELIED UPON BY BUYER IN MAKING THE DETERMINATION**

**TO EXECUTE AND CLOSE PURSUANT TO THIS AGREEMENT AND, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL WARRANTIES … ARE DISCLAIMED**."

[**Exhibit 1**]

Paragraph 25 of the Purchase Agreement, entitled "**No Representations**", states, in relevant part, as follows:

> "No broker, salesperson, or other person has been authorized to give any information or make any representations other than those contained in writing within the offering materials provided by Seller, and if given or made, **such information or representations must not be relied upon** as having been authorized by Seller. …"

[**Exhibit 1**]

Paragraph 27 of the Purchase Agreement, entitled "**Inducement**", states, in relevant part, as follows:

> "Buyer acknowledges that the **primary inducement** for Buyer to purchase under this Agreement **is the Unit itself** …"

[**Exhibit 1**]

Paragraph 32 of the Purchase Agreement, entitled "**Entire Agreement**", states, as follows:

> "This Agreement is wholly integrated and shall supercede any and all previous and current understandings and agreements between Buyer and Seller, and **this Agreement represents the entire agreement between Buyer and Seller**. No modification of this Agreement shall be valid unless in writing and signed by both Buyer and Seller. Any modification not in compliance herewith shall be null and void and of no force or effect. **Brochures and advertising representations and illustrations constitute general concepts only**, and are subject to change and modification at Seller's sole discretion."

[**Exhibit 1**]

Thus, simply from the Purchase Agreement, Plaintiffs not only knew, but agreed, that they could not rely on any oral or written statements which were not contained in the Condominium Documents, such as those which may appear in any of the Marketing Materials.

However, even if that were not enough, the Property Report [**Exhibit 2**] contained numerous additional disclaimers which would have put any reasonable purchaser on notice of both the risks and the need to conduct due diligence prior to signing.  Indeed, the very cover of the Property Report warns buyers to "**READ THIS PROPERTY REPORT BEFORE SIGNING ANYTHING**", that "**NO FEDERAL AGENCY HAS JUDGED THE MERTIS OR VALUE, IF ANY, OF THIS PROPERTY**" and that the buyer has "fifteen (15) days after the date you sign a contract or agreement … to cancel."  [**Exhibit 2**]

The Property Report then advises all buyers to seek the advice of counsel before signing:

> "Since the purchase involves a major expenditure of money, **it is recommended that you seek professional advice before you obligate yourself**."

[**Exhibit 2**]

Additionally, the Property Report warned all buyers to "read all warnings carefully before signing":

> "**WARNING**
> **THROUGHOUT THE PROPERTY REPORT, THERE ARE SPECIFIC WARNINGS CONCERNING THE DEVELOPER, THE CONDOMINIUM, OR INDIVIDUAL UNITS.  BE SURE TO READ ALL WARNINGS CAREFULLY BEFORE SIGNING ANY CONTRACT OR AGREEMENT.**"

[**Exhibit 2**]

Based upon these clear and unambiguous provisions, Plaintiffs simply cannot, as a matter of law, demonstrate that a "reasonable purchaser", buying a luxury condominium, "would have relied on the [alleged misrepresentations and omission] in deciding whether to purchase the

property."  Indeed, virtually the exact same provisions were more than enough for the Court in *Garcia v. Santa Maria Resort, Inc.* to find that plaintiffs had no cause of action for claims of fraud, including those alleged under ILSA.

In *Garcia*, purchasers of condominium units brought suit against the developer and real estate agents to recover their deposits alleging, among other things, that the defendants made a series of both oral and written misrepresentations to induce the plaintiffs to enter into their purchase contracts.  Notably, the purchase contracts in *Garcia* contained some of the very same provisions contained in the Purchase Agreements signed by the Plaintiffs in this case, including, "Oral Representations Cannot Be Relied Upon …", "Purchaser has not relied upon any prior agreements or representations …" and that the contract and condominium documents "represent the entire agreement".  Finding no cause of action as to plaintiffs' claims for fraudulent misrepresentation, negligent misrepresentation and violation of ILSA's fraud provision, the very same claims alleged here, the Court held that the plaintiffs "could not reasonably have relied on any of the alleged misrepresentations" and that "[n]o reliance could be reasonable" in view of these express provisions.

The court reached a similar result in *Weaver v. Opera Tower, LLC*.  Like our case, in *Opera Tower*, a group of condominium buyers brought assorted fraud claims against a developer, including under ILSA § 1703(a)(2)(B), claiming that certain oral and written misrepresentations had been made, either in the marketing brochures or by agents of the developer, concerning the project.  Finding that plaintiffs had no cause of action, the Court stated "while the Brochure undoubtedly contains various promotional statements, such representations are expressly contradicted and superseded by [the merger clause] of the executed Agreements."  Among other things, that provision provided that the purchase agreement "contains the entire

understanding", that the promotional materials "are for promotional purposes only and may not be relied upon" and that the buyers "have not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium Documents" – the very same provisions contained in the Purchase Agreements signed by the Plaintiffs here.  Thus, the court concluded that a reasonable purchaser could not have possibly relied on the marketing materials.

Equally noteworthy is the Middle District's analysis in *Taplett v. TRG Oasis (Tower Two), Ltd., LP, supra.* (Judge Mills).  Analogous to our case, in *Taplett*, the buyer sued the seller for violating ILSA § 1703(a)(2) by representing that the condominium would be a good investment -- without providing certain written disclosures to the buyer required by law.  Unfortunately for the buyer, however, the purchase contract in *Taplett*, like the Purchase Agreements here, contained a "merger clause", warned the buyer that "oral representations cannot be relied upon" and stated any "oral statements of sales representatives or others … are void and have no effect."  Id. at 1203. Furthermore, the purchase contract specifically disclaimed reliance upon representations regarding the unit's investment potential.  Id.  Finding no cause of action, the Court therefore reasoned that while typically "reliance should be presumed" where there is a material omission, "where provisions of a Purchase Agreement expressly disclaim reliance on prior oral representations, courts have found no reasonable reliance as a matter of law."  Id.  Based on the provisions in the purchase contract, "the presumption of reliance has been definitively rebutted."  Id.  The same result should apply here.

However, even assuming, *arguendo*, that these disclaimers are not sufficient to defeat Plaintiffs' ILSA claim, the documents contained a multitude of other **specific** disclosures which would make it impossible for a reasonable purchaser to have relied on any of the Alleged

Misrepresentations or the Alleged Omission.   For example, while Plaintiffs contend that Defendants presented themselves as a "developer" of the Project, Plaintiffs cannot point to a single document where Defendants stated that they were the "developer."   Instead, at most, Defendants used descriptive words like "developed" and "development".

In any event, the Condominium Documents clearly disclosed that SimDag - not the Defendants - was both the "Seller" and "Developer" of the Project.   For example, the Purchase Agreement (a) identifies SimDag (on the very first page) as the "Seller" of the condominium unit, and (b) states that "[s]eller agrees to construct the Unit in substantial conformance with the plan and specifications on file in Seller's local Sales Center office."   [**Exhibit 1**] Thus, the Purchase Agreement clearly notified each Plaintiff that SimDag, not Mr. Trump, was responsible for constructing the Building.

Similarly, the Property Report identified SimDag as "Name of Developer" on the front cover and provides on page 5 that the "Developer of the Condominium is" Simdag.  [**Exhibit 2**] Indeed, other than the title of the Purchase Agreement ("Trump Tower Tampa, A Condominium"), the name "Trump" appears in none of the documents.

The Property Report contains numerous other provisions making it clear that SimDag, not Defendants, was ultimately responsible for and controlled the Project.   Specifically, the Property Report disclosed that SimDag:

> "will obtain the necessary building permits" for the Project;
>
> "will be responsible for investigation and remediating [Environmental] conditions,"
>
> will "pay for all of the construction costs",
>
> will be responsible for constructing "the infrastructure associated with the central water system . . . [and]  . . . sewer system; and

will be "solely responsible for the construction of all the recreational facilities."

[**Exhibit 2**]

Just as important, the Property Report openly disclosed the fact that SimDag had never developed condominiums before:

> Although its principals and officers have extensive real estate experience, the Developer has not had any significant operating experience. **The Developer has not had prior experience in the development of condominiums**. The Developer has not yet begun construction of the Condominium Project and, accordingly, has not closed on any condominium units. Because of lack of operating experience, the Developer does not have audited financial statements as of the date of filing of this Property Report.

[**Exhibit 2**]  This expressly contradicts the very Marketing Materials on which Plaintiffs claim to have relied, which describe Trump as having developed condominiums around the world.

[**Exhibit 8**]  Given this provision, a reasonable purchaser could not have possibly relied on the Alleged Misrepresentations or Alleged Omission.

The Property Report then goes on to disclose, on multiple occasions that because of SimDag's inexperience and the fact that deposits were being used for construction and not fully escrowed, buyers could lose their deposits:

> "The Developer has experienced a net operating loss during the last fiscal year. This may affect the Developer's ability to complete the promised facilities and to discharge financial obligations."

[**Exhibit 2**]

> **"YOUR ESCROW ACCOUNT WILL NOT FULLY PROTECT YOU. BEFORE CLOSING, IT IS POSSIBLE THAT YOUR DEPOSITS YOU HAVE MADE UNDER THE SALES CONTRACT MAY BE USED BY US FOR PROJECT CONSTRUCTION, TO ACQUIRE TITLE TO THE LAND, OR OTHER PROJECT COSTS. WHILE WE INTEND TO COMPLETE THE PROJECT, IT IS POSSIBLE THAT THE**

**PROJECT MA NOT BE COMPLETED.   IF YOUR DEPOSITS HAVE BEEN DISBURSED TO PAY PROJECT COSTS, THERE IS A RISK THAT YOU COULD LOSE YOUR DEPOSIT."**

[**Exhibit 2**]

Finally, the following disclaimer appears throughout some of the very brochures which

Plaintiffs claim induced them to sign their Purchase Agreements, including the Silver Book:

> "This Announcement is furnished to provide general information about the property described herein and is subject to change without notice.  **The presentation of these materials does not constitute any representation or warranty by Donald J. Trump**, SimDag-Robel, LLC or the Toni Everett Company and may not be relied upon by any person or entity.   Oral representations cannot be relied upon as correctly stating the representations of the developer.   For correct representations, reference should be made to the documents required by section 718.503 Florida Statutes, to be furnished by a developer to a buyer or lessee.   This offering is made only by the prospectus for the condominium and no statements should be relied upon if not made in the prospectus."

[**Exhibit 10**]

In the face of all of these statements, disclosures and warnings, it is simply not credible

that any reasonable purchaser, contracting to purchase high-end luxury condominiums, would

have relied on the alleged misrepresentations or the alleged omission.

> (b)     **The Terms "Partner" and "Developer" Are Vague, Ambiguous and Susceptible to So Many Different Definitions and Interpretations That They Cannot be Actionable as a Matter of Law.**

As this Court has previously stated in its Order on Plaintiffs' Motion for Summary

Judgment, "the plaintiffs argue that, even though Trump was neither a developer nor a partner

nor an investor in the project but merely a licensor, Trump presented himself as a partner in, and

a developer of, the project."   (Dkt. 136 at 3.)   However, because the terms "partner" and

"developer" are susceptible to so many different definitions and interpretations, they cannot form the basis for Plaintiffs' ILSA claim.

Since the materiality analysis requires the trier of fact to determine what inferences a reasonable purchaser would draw from alleged misleading statements, the alleged statements must be clear, unambiguous, and capable of definition.  *See In re Winn-Dixie Stores, Inc.*, 531 F. Supp. 2d 1334, 1343 (M.D. Fla. 2007).   Statements that are "too vague to verify" are "not actionable because reasonable investors do not rely on them in making investment decisions".  *See Id.* at 1343-44; *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1239 (M.D. Fla. 2002)(stating that "vague and non-defined statements" that are "devoid of any substantive content" and "neither quantified nor specified in any way," "are not material since they could not reasonably have been relied upon . . . .").

The terms "partner" and "developer", however, are descriptive and simply too vague and ambiguous to form the basis for Plaintiffs' claim.   The word "partner", for instance, simply suggests a collaboration between two parties, whether in business or otherwise.   Such collaboration may be formally documented, like in the case of a partnership agreement, or not documented at all.   From a legal perspective, it can refer to an individual or entity who has invested all or no capital or who has a controlling or "silent" interest, or anything in between.  Indeed, a partner need not necessarily invest capital to have a controlling interest.   Recognizing the vague nature of the word "partner" standing on its own, Plaintiffs allege in the Complaint that Defendants "held themselves out as "true partners", suggesting yet another meaning.

(Plaintiffs' Second Amended Complaint Dkt. 19 at 2.)  Furthermore, many of the Plaintiffs in this case testified to having their own unique interpretation of the word "partner".[7]

The same is true with respect to the words "developer", "development" and "developing".  To begin with, Plaintiffs do not point to a single instance in which Defendants stated that they were the "developer" of the Project.  As for the terms "development" and "developed", at best, they are general descriptive words which can refer to all sorts of levels of involvement in a project, ranging from the owner to the interior designer.  Indeed, Plaintiffs allege in the Complaint that Defendants held themselves out as "joint developers" of the Project, which suggests yet another meaning.  (Plaintiffs' Second Amended Complaint Dkt. 19 at 2.)

Moreover, as this Court previously noted, ILSA § 1701(5) defines "developer" as "'any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision.'" (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 7.)  Under this interpretation, someone who has no financial interest, investment or other stake in a project, but who "indirectly advertises for sale" a parcel of real estate could arguably

---

[7] For instance, Elaine Lucadano [**Exhibit 11**] testified that her "understanding of a partnership" is when "all of the partners are responsible for all of the costs" (Dep. at 36), Rosanne Schanne [**Exhibit 12**], stated that "partnerships can be other than 50-50" (Dep. at. 37), Patrick Rodgers [**Exhibit 13**] acknowledged that "a partner doesn't have to invest money" (Dep. at 35), Davey Sehwani [**Exhibit 14**], recognized that "the roles and duties of partners and partnerships can vary from partnership to partnership" (Dep. at 44-45), Chidi Ahanotu [**Exhibit 15**] explained that a "partnership" is simply when "both people have a vested interest" and may involve an investment of "sweat equity" (Dep. 19), Thomas Frederick [**Exhibit 16**] acknowledged that there are many different types of partnerships, including "life partners" (Dep. at 49), Martin Herskovitz [**Exhibit 17**] (on behalf of H2O Front Investments, LLC) stated that, because he had paid a deposit, he felt like SimDag and Trump "were actually partners with [him] in this project" (Dep. at 56) and Lenard Rodgers [**Exhibit 18**] admitted that even Trump's licensing arrangement with SimDag could be considered a "form of partnership" (Dep. at 89).

be considered a "developer".[8]  (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 7.)  Plaintiffs cannot claim, as they do here, that Defendants are "developers" under ILSA, but that their alleged use of the words "developer", "development" and "developed" to describe their role constitutes a material misrepresentation.  At a minimum, the inconsistency in Plaintiffs' argument serves only to reinforce the fact that the terms "partner" and "developer" are subject to so many different definitions and interpretations, they cannot serve as the basis for imposing liability.

### (c )  The Alleged Omission Did Not Materially Alter the "Total Mix" of Available Information.

Even assuming that a reasonable purchaser would have relied notwithstanding the language in the Condominium Documents, the Alleged Misrepresentations and Alleged Omission did not materially alter the total mix of information and disclosures that were provided to buyers.

For an omitted fact to be "material," there must be a "showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [purchaser]."  *TSC Industries Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).[9]  Stated another way, "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).  "[I]f [a]

---

[8] It should be noted that Defendants do not concede that such a broad, overly inclusive definition is proper.

[9] While Plaintiffs may argue that Defendants' reliance on certain securities cases is misplaced, it is well settled that ILSA § 1703(a)(2) is "modeled on" the securities laws and should be interpreted in accordance therewith.  *Taplett supra* at 1202.

defendant can show that plaintiff's decision would not have been affected if defendant had disclosed the omitted facts, then recovery is barred." *Grossman v. Waste Management*, 589 F.Supp. 395, 400-401 (N.D. Ill. 1984).

In this case, given the information provided to buyers in the Marketing Materials and the disclosures in the Condominium Documents, the Alleged Omission could plainly not have been viewed as assuming actual significance or significantly altering the "total mix" of information made available. For instance, one of the Alleged Misrepresentations relied on by Plaintiffs was "a press release stating that the Trump Tower Tampa 'will be developed in a partnership with local Tampa Bay-area developers, SimDag-Robel, LLC'". (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 3.) However, Plaintiffs neglect to mention that this very same press release later explains that "SimDag-Robel, LLC is a partnership of five successful, Tampa Bay-area real estate veterans: Dr. Howard Howell, Patrick Sheppard, Frank Dagostino, Jody Simon and Robert E. Lyons." Notably, the press release does not state that Trump is a partner in SimDag.

Similarly, Plaintiffs make much of the fact that the Silver Book contained "the project's logo, which identifies the project as 'Trump Tower Tampa – A Donald J. Trump Signature Property-A Development of Donald J. Trump and SimDag-Robel, LLC'". (Order on Plaintiffs' Motion for Summary Judgment Dkt 136 at 3.) However, Plaintiffs ignore the fact that, apart from disclaiming any "representation or warranty by Donald J. Trump" which "may not be relied upon", the Silver Book also explains how "Jody Simon, Frank Dagostino and Bob Lyons of SimDag and Dr. Howard Howell and Patrick Sheppard of Robel" came together to form SimDag-Robel LLC and "develop" the Project. [**Exhibit 5**] Again, nowhere does it say that Trump is a partner in SimDag. The Silver Book then goes on to state how, after forming

Simdag, the principals "contacted" Trump to see if he would be "interested in participating as a partner and giving this building the distinction of [a] Donald J. Trump Signature Property?  He was, and the ambitious new project had a **name**: Trump Tower Tampa" (emphasis added).

Moreover, the Condominium Documents make abundantly clear that SimDag - not the Defendants - was both the "Seller" and "Developer" of the Project [**Exhibits 1** and **8**], that SimDag – not Defendants – "agrees to construct the Unit" [**Exhibit 1**], that SimDag – not Defendants - "has not had any significant operating experience" [**Exhibit 2**], that SimDag – not Defendants – "has not had prior experience in the development of condominiums" [**Exhibit 2**], that SimDag – not Defendants – "has not yet begun construction of the Condominium Project" [**Exhibit 2**], that SimDag – not Defendants – "does not have audited financial statements" [**Exhibit 2**] and that SimDag – not Defendants -- "has experienced a net operating loss during the last fiscal year" [**Exhibit 2**].  Indeed, other than the title of the Purchase Agreement --"Trump Tower Tampa, A Condominium" -- the name "Trump" appears in none of the documents. [**Exhibit 1**]

Finally, a number of Plaintiffs openly acknowledged that the only thing that truly mattered to them was that the Building was not built.  For instance, when asked if they would have brought this lawsuit had the Project been completed, plaintiff Terrence Collins [**Exhibit 19**] responded, "Probably not" (p. 55), plaintiff Deborah Frederick [**Exhibit 20**] stated "No. I wouldn't be suing him because I [would] be living there" (p. 66), plaintiff Thomas Bower [**Exhibit 21**] testified "No" (p. 51) and "I didn't care who built the building, as long as the building was being built" (p. 48) and Ilan Brand [**Exhibit 22**] (on behalf of plaintiff Arroyo Holdings, LLC) testified "If the building had been build on time and according to the standard that Trump promised, then I probably would not have problems. … I wouldn't file this present

lawsuit" (p. 45-46).  In fact, plaintiff <u>Thomas Bower</u> [**Exhibit 21**] testified that he was "the one that told [his] salesman", fellow plaintiff <u>Blaine Panico</u>, that Trump "was being paid for his name on the building" and that Trump's role in the Project was "no hidden secret" (p. 28).

Thus, given all of the foregoing, Plaintiffs were, at a minimum, on constructive, if not actual, notice, that (i) SimDag and Defendants were separate entities, (ii) Defendants were not partners <u>in</u> SimDag, (iii) SimDag - not Defendants - was the party ultimately responsible for constructing and developing the Project and (iv) SimDag had entered into a business arrangement with Trump whereby he had agreed to lend his name.  In fact, that is exactly what occurred as memorialized in the License Agreement.  Furthermore, while Plaintiffs contend that they were not informed that Trump could remove his name from the project, Plaintiffs were fully informed that it was "possible that the Project may not be completed." [**Exhibit 2**]  In any event, it would be patently unreasonable for a purchaser to conclude that the relationship between SimDag and Defendants could never be terminated and that the "Trump" name could never be removed.  As a result, reasonable minds cannot differ that had the legal name of the agreement between SimDag and Defendants - *i.e.*, the "License Agreement" –been mentioned in the Condominium Documents, it would not have "significantly altered the 'total mix' of information made available" or "assumed actual significance."

> **(d)** **The Court Should Grant Final Summary Judgment as to Plaintiffs Schanne, Williams, Panico, Jaensch, Bower, Aaron, Ahanotu, Warren, Halligan, Rodgers, Caruso, Zwick, Naik, Mitchell, Sehwani, Italiano, Tamboli, Burge, Olipra, Galiouridis, Benvenuti and Gesemeyer Because They Did Not Read The Condominium Documents Before Signing their <u>Purchase Agreement</u>**

To establish ILSA liability for the Alleged Omission, Plaintiffs must demonstrate that, prior to signing, they actually read the documents in which the omitted language should have

appeared, in this case, the Condominium Documents.  *See Friedman v. Solomon Brothers, Inc.*, 42 F.3d 1399, 1994 WL 684513, 3 (9th Cir. 1994) (granting summary judgment on claim for misrepresentation by omission where the plaintiffs conceded that they "did not read any of the prospectuses or other materials" which had been given to them); *Grossman supra at 401* ("proof that the plaintiff did not read the publication in which the omissions occurred has been held sufficient to rebut the presumption of reliance.")  If Plaintiffs did not read the Condominium Documents, they cannot claim that it would have mattered had the existence of the License Agreement been disclosed.  As the Court explained in *Garcia*:

> "Quite simply, Plaintiffs should not be rewarded for consciously choosing not to read their Purchase Contracts. Rather, as the Eleventh Circuit held in *Intuitive Surgical,* all plaintiffs are bound by the provisions of contracts they have executed, irrespective of whether they bother to read them. Hence, Plaintiffs' admitted failure to read their Purchase Contracts prevents them from satisfying the reliance element of their claims for securities fraud (Count I), ILSA violations (Count II), FDUTPA violations (Count III), negligent misrepresentation (Count IV), and false advertising (Count VI); therefore, these claims are dismissed with prejudice."

528 F. Supp.2d at 1296.

The court addressed this exact issue in *Kenney v. State Street Corp.*, 754 F.Supp.2d 288 (D.Mass. 2010).  In *Kenney*, a employee brought suit against an employer for fraudulent inducing the employee to invest in the company's retirement plan by failing to disclose material information concerning the company's financial condition in both a press release and the company's 8-K.  When the employee was deposed, however, he testified that he failed to read those documents.  Granting defendant's motion for summary judgment, the court explained that in order to prove misrepresentation by omission, a plaintiff must demonstrate that the omitted facts would have been "'material in the sense that a reasonable investor might have considered

them important in the making of this decision.'"  *Id.* at 292, *citing Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  However, "the fact that the plaintiff  did not read the [press release and 8-K] rebuts the presumption of reliance regarding [defendant's] nondisclosures by suggesting that he would not have read this information if it had been disclosed."  *Id*. at 293.

The result should be no different here, particularly in light of the testimony by a number of Plaintiffs that they did not bother to even read the Condominium Documents.  Specifically:

Plaintiff Rosanna Schanne **[Exhibit 12],** when asked if she read her Purchase Agreement testified "No, I did not" (Dep. at 42);

Plaintiff Clifford Williams [**Exhibit  23**], when asked if read his Purchase Agreement before he signed it, stated "Not really.  Not completely, no" (Dep. at  29);

Plaintiff F. Blaine Panico [**Exhibit  24**], when asked if he recalled ever reading the Property Report, testified "No" (p. 59);

Plaintiff Cheri Rodger Jaensch [**Exhibit 25**], when asked whether she read the Purchase Agreement before signing it, testified "I would say, no" (Dep. at 40);

Plaintiff Thomas Bower [**Exhibit 21**], in referring to the Property Report, testified that he "wouldn't read that document, that's for damn sure" (Dep. at 43);

Plaintiff Ilene Aaron [**Exhibit 26**], when asked whether she read her Purchase Agreement before signing it, stated "No" (Dep. at 30);

Plaintiff Chidi Ahanotu [**Exhibit 15**], when asked if he read the Property Report before signing his Purchase Agreement, testified "I'm not sure" (Dep. at 47);

Plaintiff <u>Thomas Warren</u> [**Exhibit 27**], when asked if he read every word of his Purchase Agreement, testified "Probably not" (Dep. at 40);

Plaintiff <u>Dwight Halligan</u> [**Exhibit 28**], when asked whether he read the Property Report, testified "No" (Dep. at 35);

Plaintiff <u>Patrick Rodgers</u> [**Exhibit 13**], when asked whether he read his Purchase Agreement, stated "I read the first page about the money, is what I read" (Dep. at 48);

Plaintiff <u>Art Caruso</u> [**Exhibit 29**], when asked whether he read the Purchase Agreement before signing, testified "Not all of it" (p. 71) and, when asked if he read the Property Report before signing, testified "No" (Dep. at 73);

Plaintiff <u>William Zwick</u> [**Exhibit 30**], when asked whether he read the Property Report before signing his Purchase Agreement, testified "No, I don't believe so" (Dep. at  46);

<u>Rajankumar Naik</u>, testifying on behalf of Plaintiff <u>Naik Family Limited Partnership</u> [**Exhibit 31**], when asked if he read the Purchase Agreement before signing it, stated "I read it, but not line by line.  I scanned it" (Dep. at 41);

Plaintiff <u>Logan Mitchell</u> [**Exhibit 32**], when asked if he read the Property Report before signing his Purchase Agreement, testified "I don't remember reading this" (Dep. at 155);

Plaintiff <u>Davey Sehwani</u> [**Exhibit 14**], when asked if he read the Property Report before signing his Purchase Agreement, testified "No" (Dep. at 90);

Plaintiff <u>Jeff Italiano</u> [**Exhibit 33**], when asked whether he read the Purchase Agreement, testified that he only "glanced though it" and "looked at specific things like the unit number to make sure it was correct, the price to make sure it was correct" (Dep. at 78);

Hoshedar Tamboli, testifying on behalf of Plaintiff Tamboli Family Limited Partnership [**Exhibit 34**], when asked whether he read the Purchase Agreement, stated, "What little I could read as far as the most important thing was the numbers whether the numbers were accurate or not the moneys in the agreement" (Dep. at 57);

Alayna Burge for Plaintiff Burge Holdings, LLC [**Exhibit 35**], whether she read her Purchase Agreement, "Some of it, but not the – I don't think the entire thing.  I don't recall" (Dep. at 57);

Plaintiff Kenneth Olipra [**Exhibit 36**], when asked if anything in the Property Report gave him cause for concern, testified, "You know, I didn't read it thoroughly so I can't really competently answer that question" (Dep. at 52);

Plaintiff George Galiouridis [**Exhibit 37**], when asked whether he read his Purchase Agreement, testified "Not every page" (Dep. at 36);

Plaintiff Benjamin Benvenuti [**Exhibit 38**], when asked whether he read his Purchase Agreement, testified "Probably not entirely" (Dep. at 36) and when asked if he read the Property Report, stated "I'm sure I just skimmed it and did not read every sentence" (Dep. at 37-38); and

Plaintiff Robert Gesemeyer [**Exhibit 39**], when asked whether he read the Property Report, testified "I can't say for sure that I did.  I'm sure I went through it, at least briefly" (Dep. at 50).

In short, because the above-referenced Plaintiffs did not read the Condominium Documents, even if the Alleged Omission had been disclosed in the Condominium Documents, they would not have seen it.  Accordingly, at a minimum, and as a matter of law, final summary

judgment should be granted as to the claims of the aforementioned Plaintiffs based on the Alleged Omission.

### 2. Defendants Made No Misleading Statements or Omissions.

No liability under ILSA § 1703(a)(2) can arise where the alleged misstatements were accurate in light of the circumstances in which they were made. *See Price v. Owens-Illinois Development Corp.*, 646 F. Supp. 314, 317-18 (M.D. Ga. 1986). That is exactly the situation here.

Though Plaintiffs contend that "Trump presented himself as a partner in, and a developer of, the project" (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 3), not only are these terms too vague and ambiguous, but, a closer look at the Alleged Misrepresentations shows that such statements were entirely accurate. For instance, while some of the Plaintiffs point to a press release stating that the Project "will be developed in a partnership with local Tampa Bay-area developers, SimDag-Robel, LLC", the statement was entirely accurate since (i) it is undisputed that Trump was, in fact, working "with local Tampa Bay-area developers, SimDag-Robel, LLC"; and (ii) the press release goes on to explain that SimDag "is a partnership" between "Dr. Howard Howell, Patrick Sheppard, Frank Dagostino, Jody Simon and Robert E. Lyons." Nor was "the project's logo, which identifies the project as 'Trump Tower Tampa – A Donald J. Trump Signature Property-A Development of Donald J. Trump and SimDag-Robel, LLC'", misleading given the fact that the marketing booklet in which it appears explains how the principals in SimDag "contacted" Trump to see if he would be interested in lending his name.

Plaintiffs also identify "instances in which Trump and the Trump Organization allegedly acted in a manner 'consistent with their advertised role as a developer of the project,' which instances include (1) the defendants' reviewing and approving promotional material, (2) the

defendants' approving plans and specifications for the development, and (3) the defendants' controlling the preliminary and final plans."   (Order on Plaintiffs' Motion for Summary Judgment Dkt. 136 at 3-4.)   However, the three (3) examples identified by Plaintiffs describe exactly what Trump's rights and obligations were under the License Agreement.   [**Exhibit 7**] Thus, they were not a misrepresentation.   Moreover, Plaintiffs cannot, on the one hand, accuse Defendants of misrepresenting themselves as "developers" of the Project, but, on the other hand, argue that Defendants actually were "developers" under ILSA.

Finally, Plaintiffs contend that, by failing to disclose the existence of the License Agreement in the Condominium Documents, Defendants led Plaintiffs to believe that they were the "developer" of the Project.   However, not only did the Condominium Documents clearly disclose that SimDag was both the "seller" and "developer" of the Project, but, as the court held in *Degrimenci v. Sapphire-Fort Lauderdale*, LLP, 693 F.Supp.2d 1325 (S.D. Fla. 2010), under ILSA, there is no requirement that the condominium documents disclose who is **<u>not</u>** the developer.   As the Court explained:

> "Sapphire and GP assert that not a single provision of the ILSFDA, including section 1707, requires the property report to identifies parties which are not the developer.   The Court agrees with Sapphire and GP and does not find Plaintiff's argument persuasive. Thus, to the extent any ILSFDA claims are premised on the omission of a statement that the developer is not Altman, they are hereby dismissed with prejudice."

*Id.* at 1340.

**C.    Court Should Enter Final Summary Judgment as to Plaintiffs' Negligent Misrepresentation Claim (Count II) Because Plaintiffs Cannot Demonstrate "Reasonable Reliance" and Defendants Were Not In The Business of <u>Supplying Information</u>**

In *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So.2d 334 (Fla.1997), the Florida Supreme Court adopted <u>Section 552</u> of the <u>Restatement (Second) of Torts</u> to describe the

elements of <u>both</u> negligent misrepresentation (Count II) and information negligently supplied (Count III).  In essence, <u>Section 552</u> imposes liability upon any person who (i) in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, (ii) negligently supplies false information to another, (iii) for the purpose of inducing that person's reliance and (iv) resulting in injury to that person acting in justifiable reliance upon the false information.  Thus, not only must a plaintiff demonstrate that he was justified in relying on the false statement, but that the defendant was in the business of supplying information such that the defendant owed a duty of care to the plaintiff.  *See Blumstein v. Sports Immortals, Inc.*, 67 So.3d 437 (Fla. 4th DCA 2011)(*citing Reimsnyder v. Southtrust Bank, N.A.*, 846 So.2d 1264, 1267 (Fla. 4th DCA 2003) for the proposition that "[s]ection 552 has been interepreted as limiting liability for the supply of false information to those entities that are in the business of supplying a particular type of information.")

In this case, Plaintiffs cannot demonstrate either of these elements.  Although the Court in *Gilchrist* went so far as to extend <u>Section 552</u> to a seller of real estate, it is undisputed that Defendants were not the sellers of this Project.  Furthermore, as demonstrated herein, in the face of all of the statements, disclosures and warnings in the Condominium Documents and considering the fact that the terms "partner" and "developer" are so vague, ambiguous and susceptible to so many different definitions and interpretations, a purchaser, contracting to buy a high-end luxury condominium, would not have been justified in relying on the Alleged Misrepresentations or Alleged Omission.

Based on the foregoing, Count II of Plaintiffs' Complaint fails as a matter of law.

**D.    Court Should Enter Final Summary Judgment as to Plaintiffs' Fraudulent Misrepresentation (Count III) Because Plaintiffs Fail to Factually Establish All of the Elements Required to Demonstrate Fraudulent Misrepresentation**

"To state a claim for fraud, a plaintiff must show (1) a false statement or an omission of material fact, (2) knowledge of the statement's falsity, (3) intent to induce reliance, and (4) injury resulting from the plaintiff's relying on the statement." *Drilling Consultants, Inc. v. First Montauk Securities Corp.*, 2011 WL 3792408 (M.D.Fla. 2011).  In this case, Plaintiffs cannot, as a matter of law, demonstrate any of the elements of their claim.  Specifically, as established above, Defendants did not make any false statements or material omissions.  Thus, Plaintiffs cannot show that a misstatement or omission was made, that Defendants had knowledge of the falsity or that Defendants intended to induce reliance.

Furthermore, even if Plaintiffs could demonstrate the Alleged Misrepresentations or the Alleged Omission, they cannot show that damages resulted therefrom.  As shown above, to prove fraudulent misrepresentation, a plaintiff must show that it "incurred damages proximately caused by the breach".  *See Capps Agency v. MCI Telecommunications Corp.*, 863 F.Supp. 1555, 1558 (M.D.Fla. 1993).  "If a plaintiff claims to be misled, but cannot demonstrate a causal connection between the defendant's conduct and the plaintiff's misapprehension, the plaintiff cannot recover." *Humana, Inc. v. Castillo*, 728 So.2d 261 (Fla. 2d DCA 1999).

In this case, however, it is undisputed that the reason why Plaintiffs lost half their deposits had nothing to do with the Alleged Misrepresentations or the Alleged Omission. Instead, their loss was because the Project was not completed and there is no evidence that the Project was not completed because of the Alleged Misrepresentations or the Alleged Omission. *See* Deposition Transcripts of Patrick Rodgers [**Exhibit 13**] (the reason the Project was not completed had "[s]omething to do with the pilings"; Dep. at 91); Kenneth Olipra [**Exhibit 36**] ("You know, I really don't know why it didn't get built"; Dep. at 105); Martin Herskovitz

[**Exhibit 17**] (on behalf of H2O Front Investments, LLC) ("Well I think the real estate market came apart"; Dep. at 60); Hoshedar Tamboli [**Exhibit 34**] (on behalf of Tamboli Family Limited Partnership) ("they couldn't raise money to build the building"; Dep. at 70);  George Galiouridis [**Exhibit 37**] (SimDag "could not get financing because the market changed"; Dep. at 54); Michael Dinkel [**Exhibit 40**] ("That's a good question.  I don't think I know"; Dep. at 62); Deborah Frederick [**Exhibit 20**] ("something was wrong with the ground … they didn't sell 50% of the building"; Dep. at 50); Elaine Lucadano [**Exhibit 11**] ("financing could not be secured"; Dep. at 78).

In addition and not surprisingly, numerous Plaintiffs have already testified that had the Project been completed, they would not be suing Defendants.  *See* Deposition Transcripts of Terrence Collins [**Exhibit 19**] (Dep. at 55); Deborah Frederick [**Exhibit 20**] (Dep. at 66); Ilan Brand [**Exhibit 22**] (on behalf of Arroyo Holdings, LLC) (Dep. at 45-46); Kenneth Olipra [**Exhibit 36**] (Dep. at 56); Thomas Bower [**Exhibit 21**] (Dep. at 51); Jeff Italiano [**Exhibit 33**] (Dep. at 81).

Based on the foregoing, Count III of Plaintiffs' Complaint fails as a matter of law.

**E.   Final Summary Judgment as to Plaintiffs' Information Negligently Supplied Claim (Count IV)**

As discussed above, Section 552 of the Restatement (Second) of Torts sets forth the standard for both a claim for negligent misrepresentation and a claim for information negligently supplied.  Because the elements and Plaintiffs' allegations of the two claims are the same, the Court should grant final summary judgment as to Count IV for the reasons set forth in Section C above.

**F.**     **Final Summary Judgment as to Plaintiffs' Alleged Punitive Damage Claims**

Summary Judgment should also be entered in favor of Defendants as to Plaintiffs' claims for punitive damages subject to Counts II, III and IV.  "Under Florida law punitive damages are available only upon a showing that the act complained of is characterized by 'willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, deliberate violence, moral turpitude, insult, or fraud.'"  *Cook v. Deltona Corp.*, 753 F.2d 1552 (11th Cir. 1985), *citing* 17 Fla.Jur.2d Damages § 119 (1980).  In the case of a tort claim, "mere negligence" or even "gross negligence" is not enough.  *Auto-Owners Ins. Co. v. Hooks*, 463 S0.2d 468, 473 (Fla. 1st DCA 1985).  Instead, "there must be an additional showing of malice, moral turpitude, wantonness or willfulness."  *G.M. Brod & Co., Inc. v. U.S. Home Corp.* 759 F.2d 1526 (11th Cir. 1985).

There is no record evidence in this case that Defendants' actions were punitive, as defined and required by Florida Law.  Thus, Plaintiffs' claim for punitive damage fails as a matter of law and summary judgment should be granted as to the same.

**G.**     **Final Summary Judgment Should be Granted on All Counts as to Trump Org. Because Plaintiffs Do Not Allege Any Wrongdoing Against Trump Org.**

Plaintiffs have named both Trump and Trump Org. as defendants in this action.  However, there is no record evidence of wrongdoing by Trump Org.  For example, a review of the Press Release [**Exhibit 8**] shows that it was issued by Trump – not Trump Org ("Donald J. Trump announced today ...").  Similarly, the Silver Book Logo refers to Trump – not Trump Org.  ("A Donald J. Trump Signature Property").  [**Exhibit 10**]  With respect to the Publications, Plaintiffs claim that Trump – not Trump Org. – "'actively marketed' and presented *himself* as a 'partner' in, and a 'developer' of, the Trump Tower Tampa".  And, finally, with respect to the License Agreement Obligations, it is undisputed that it was Trump – not Trump Org. – who was

a party to that agreement. [**Exhibit 7**]  Based upon the foregoing, Defendants respectfully request that summary judgment be granted in favor of Trump Org. as to all of Plaintiffs' claims.

**IV.** <u>**CONCLUSION**</u>

WHEREFORE, and based upon the foregoing record evidence and citation of authorities, Defendants respectfully request that this Court grant Defendants' Motion for Final Summary Judgment as to all of Plaintiffs' claims, and grant any further relief that the Court deems proper.

Dated: October 31, 2011                    Respectfully submitted,

RUSSOMANNO & BORRELLO, P.A.
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103

By:     /s/  Herman J. Russomanno
          Herman J. Russomanno (Fla. Bar No. 240346)
          hrussomanno@russomanno.com
          Herman J. Russomanno (Fla. Bar No. 21249)
          herman2@russomanno.com

          /s/ Christopher L. Griffin
          Christopher L. Griffin (FBN 273147)
          (cgriffin@foley.com)
          Lauren L. Valiente (FBN 034775)
          (lvaliente@foley.com)
          FOLEY & LARDNER LLP
          100 North Tampa Street
          Tampa, Florida  33602-5804
          Telephone:  (813) 229-2300
          Facsimile:  (813) 221-4210

          *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 31st day of October, 2011, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties in this case by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/  Herman J. Russomanno III